### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

**Case No.**

ESTATE OF PHYLLIS M. MALKIN,
By its Personal Representative,
Toni Ellen Guarnero,

        Plaintiff,

v.

WELLS FARGO BANK, N.A.,
as SECURITIES INTERMEDIARY,

        Defendant.

_____ /

### PLAINTIFF'S COMPLAINT

Plaintiff, the Estate of Phyllis M. Malkin, files and asserts this Complaint against

Defendant, Wells Fargo Bank, N.A., as Securities Intermediary, and in support thereof, alleges

and says:

### PRELIMINARY STATEMENT

1.     On January 13, 2016, this Court entered summary judgment in favor of Sun Life

Assurance Company of Canada in a closely-related matter, finding as a matter of Delaware law

and undisputed fact that one of three life insurance policies taken out on the life of Phyllis M.

Malkin was a wager on her life, that the policy lacked insurable interest, and that the policy was

procured through a stranger-originated life insurance (STOLI) scheme. *See Sun Life Assur. Co.

of Canada v. U.S. Bank Nat'l Ass'n*, Case No. 14-CIV-62610-BLOOM, 2016 U.S. Dist. LEXIS

4732 (S.D. Fla. Jan. 13, 2016).

2.     On June 12, 2017, a panel of the Eleventh Circuit Court of Appeals affirmed this

Court's finding that the policy procured on Mrs. Malkin's life was a wagering contract that

lacked insurable interest and constituted a STOLI policy under Delaware law.  *See Sun Life Assur. Co. v. United States Bank Nat'l Ass'n*, 2017 U.S. App. LEXIS 10389 (11th Cir. 2017) (describing this Court's opinion as "thorough and well-reasoned.").

3.      The $4 million life insurance policy (the "Policy") at issue in this case was originated under Delaware law in tandem with the policy at issue in the *Sun Life* matter, pursuant to the same STOLI scheme, involving the same STOLI operation, and paid for by the same STOLI funder, Coventry.

4.      The only difference between this case and the *Sun Life* matter is that here, the issuing insurance carrier, American General, did not challenge the Policy's validity and chose instead to pay $4,013,976.47 (comprised of the Policy's death benefit, plus interest and other amounts) to Wells Fargo, as Securities Intermediary, shortly after Mrs. Malkin passed away in September 2014.

5.      Wells Fargo, in its capacity as Securities Intermediary, has not remitted this amount to the Estate, despite the fact that the Policy undeniably lacked insurable interest and despite the fact that it is the law in most jurisdictions—as it is in Delaware—that "[i]f a person to whom the proceeds of a [life] insurance policy are paid lacks an insurable interest and is therefore not entitled to the proceeds, he or she holds them as a trustee for the person lawfully entitled to them."  Couch on Insurance 3d, § 41:9; *see also* 18 Del. C. § 2704 (b) ("If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.").

6.      For these reasons, and as further explained below and already established as a matter of Delaware law, the Estate is entitled to an award of the entire death benefit of the Policy, plus applicable interest, attorneys' fees, and other costs and damages.

## PARTIES

7.      The Estate was established pursuant to Florida law following the death of Phyllis M. Malkin, a resident of the State of Florida.  Mrs. Malkin was at all times relevant to this complaint a citizen of the State of Florida.  The Estate is also a citizen of the State of Florida.

8.      Upon information and belief, Defendant, Wells Fargo Bank, N.A., as Securities Intermediary, is a National Banking association organized and existing under federal law with its main office located in Sioux Falls, South Dakota pursuant to its Articles of Association.  Wells Fargo is a citizen of South Dakota for purposes of diversity jurisdiction.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff, a citizen of Florida, and the Defendant, a citizen of the South Dakota, and because the amount in controversy exceeds $75,000.

10.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Estate's claims occurred in the Southern District of Florida.

## FACTS COMMON TO ALL CLAIMS

### The Policy Was A Wager and Was Owned and Controlled at the Outset By Investors Who Lacked An Insurable Interest In Mrs. Malkin's Life

11.      As stated by the Supreme Court of Delaware, it is well recognized that "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers."  *PHL Variable Ins. Co. v. Price Dawe 2006 Ins.*

- 3 -

*Trust*, 28 A.3d 1059, 1069 (Del. 2011). Insurance policies which are procured as a wager on the life of the person insured not only violate Delaware's constitutional prohibition on wagering, but they also violate the state's insurable interest requirement, which precludes investors from manufacturing life insurance policies for the purpose of resale. *Id*.

12.     Although speculators have been around for hundreds of years, never has the problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt companies or trusts, the interests of which were then securitized and sold to other investors. *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

13.     It is well established, however, that in the early 2000s, there was not a sufficient supply of existing life insurance policies that would fit the criteria needed to accumulate a suitable portfolio of policies. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id*.

14.     One such STOLI promoter was a family of interrelated companies collectively called Coventry, each of which was established under Delaware law and operated from the same location in Fort Washington, Pennsylvania. The Coventry entities include, but are not limited to, Coventry Financial, LLC; Coventry First, LLC; and Coventry Capital I, LLC.

15.     To amass a suitable portfolio of policies for the institutional investors who sought to securitize life insurance policies, STOLI promoters like Coventry became the so-called "originators" of policies such that they would initiate and procure policies to be sold to and held for the benefit of investors.

16.     In Delaware and other places, not only do these STOLI policies violate constitutional bans on wagering and state insurable interest laws, but they take advantage of senior citizens like Mrs. Malkin and otherwise distort the proper use of life insurance—which is to provide actual protection to an insured's family in the event of his or her untimely death—into a cash machine whereby a stranger to the insured is actually more interested in seeing the insured dead than alive.

### Coventry Entered Into Contractual Relationships to Originate Delaware Statutory Trust-Owned Life Insurance Policies

17.     Beginning in 2001, Coventry became party to a series of contracts through which Coventry was engaged to "originate" Delaware life insurance policies that, from the start, were intended to be transferred to other investors.

18.     To manufacture such life insurance policies, Coventry's origination program followed a set pattern.  Through a network of local insurance brokers around the country, Coventry located senior citizens to serve as the insureds on new life insurance policies Coventry would create and procure on each insured's life.

19.     Coventry also routinely entered into non-exclusive agreements and other arrangements with local insurance brokers under which such brokers agreed to split with Coventry any commissions they received from the issuing insurance carrier, thus further adding to Coventry's financial incentive to originate new life insurance policies.

20.     Before any policy was even applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured and, as applicable, the insured's spouse, giving Coventry the power to "originat[e] and/or service[e] any life insurance policies on [the insured's] life, which powers specifically include[d], but [were] not limited to, the power to complete and execute any applications or other documents in connection with the maintenance or the liquidation of the [p]olicies."

21.     Prior to applying for any policy, Coventry would obtain a life expectancy report on each potential insured.  In many, if not all, cases, these life expectancy reports were obtained from American Viatical Services, LLC ("AVS"), which was Coventry's "Approved Underwriter" pursuant to an "Approved Underwriter Agreement" dated as of October 2, 2001.

22.     Coventry would then use the information provided by AVS to perform its own underwriting of each prospective insured before a policy on that person's life was applied for. The purpose of this underwriting was to, among other things, project how long any potential insured might live, and thus how valuable a particular policy might be.

23.     Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would then dictate the terms under which a policy would be applied for. Coventry, with the assistance of local insurance brokers, would start the application process by having these local insurance brokers submit incomplete applications to insurance carriers chosen by Coventry.

24.     Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, and assuming Coventry was still interested in obtaining a policy on that person's life, Coventry would then create and fund a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential policy on the

Case 1:17-cv-23136-MGC   Document 1   Entered on FLSD Docket 08/17/2017   Page 7 of 27

insured's life.  Coventry would create and fund this Delaware statutory trust by directing the local insurance broker to have the insured execute a number of non-negotiable Coventry trust documents and Coventry would then nominally fund the trust with $1.00.  The trust would have no other assets and it would be established by and for Coventry, and was expressly not intended to serve any valid estate planning need for the insured.

25.     Coventry would also have the insured execute a separate trust agreement whereby Coventry would create and fund (again with $1.00) a second Delaware statutory trust, called a sub-trust.  Under the terms of this sub-trust agreement, all assets of the initial trust were immediately transferred and assigned to the sub-trust, including any and all future rights or interests in any life insurance policy procured by Coventry, through the initial trust, on the insured's life.

26.     With regard to both Delaware statutory trusts, Coventry would choose the trustee, which was in all cases a corporate trustee located in Delaware.  Coventry's form trust agreements granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all premiums for any policy on the prospective insured's life.  The trustee was also given the power to assign the sub-trust's assets, including any future interest in any life insurance policy, to Coventry.

27.     Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry.  The formal application would identify the Delaware statutory trust in the insured's name as both the owner and beneficiary of the policy being applied for; indicate that the trust had been formed in Delaware; and state that the final application was signed by the

insured and the trustee in Delaware.  The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware.

28.     The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts under which it was engaged to "originate" life insurance policies for resale to other investors.

29.     The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware statutory trust owner.  The Delaware corporate trustee would then execute a policy delivery receipt in Delaware, acknowledging actual physical delivery and legal acceptance of the terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

30.     Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to conceal its involvement in the origination and procurement of the policy.  Under the terms of Coventry's "loan," Coventry obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

31.     But the so-called "loan" to the sub-trust was a sham.  It was structured with a 26-month term with no genuine obligation for anyone to repay and no recourse to the insured.  The "loan" otherwise carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment.  Indeed, the "loan" did not need to be repaid at all.  Instead, the "loan" was designed so that at the end of the 26-month term, all rights and interests in both the Delaware statutory trust that owned the policy and the sub-trust—specifically including all rights

and interests in the policy—could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" which, on information and belief, is exactly what occurred in the vast majority of Coventry's transactions. Regardless of whether Coventry acted through a relinquishment or otherwise, it would then install itself as the new record holder of the interests in the Delaware statutory trust that owned the policy and the sub-trust, and Coventry would then in effect own the policy.

33. Coventry would then move forward with the pre-ordained plan of selling and conveying the Delaware trust-owned policy to its pre-arranged purchaser, which would either hold the policy until maturity or resell it to another investor.

33. Coventry was then engaged by the pre-arranged purchaser to "service" the policy until the insured died, which required that Coventry would pay ongoing policy premiums on behalf of the policy's actual owner and Coventry would contact the insured or her family at least once every three months to confirm whether the insured had died yet. Once Coventry learned an insured had died, it would obtain a death certificate and prepare the necessary forms to make a claim for the policy's death benefit.

### As In the *Sun Life* Matter, The Policy In This Case Was Procured By Coventry Through A South-Florida STOLI Operation Called Simba

34. Larry Bryan (formerly known as Larry Schweiger) was a long-time life insurance producer who held insurance licenses in many different states and appointments with many different insurance companies until his insurance licenses were revoked in 2009. Dep. of L. Bryan at 16:19-17:11, 19:10-20:12, 22:15-23:15, attached hereto as Exhibit A.

35.     In early 2005, Mr. Bryan went into business in South Florida using the name Simba.[1]  Statement of Larry Bryan at 1, attached hereto as Exhibit B.

36.     Mr. Bryan served as Simba's Chairman from 2005 until Simba went out of business in 2009.[2]  Exhibit A, Dep. of L. Bryan at 50:4-19, 52:8-24, 53:15-17, 107:11-12.

37.     From 2005 through 2007, Peter Shapiro reported directly to Mr. Bryan as Simba's Director of Operations; he managed the staff and "quarterback[ed]" the day-to-day operations. Exhibit B, Statement of Larry Bryan at 3; Dep. of P. Shapiro at 16:4-18:9, 152:4-25, attached hereto as Exhibit C.

38.     Mr. Shapiro described Simba's business bluntly:  "It can also be said in a different way that it was what's called stranger-owned life insurance.  They call it STOLI, S-T-O-L-I, stranger owned life insurance."  Exhibit C, Dep. of P. Shapiro at 21:7-10.

39.     Mr. Shapiro testified that this meant that Simba acquired policies with money from entities such as Coventry through "funny transactions" that masked the true source of the premium payments and that were "not honest and straightforward and transparent."  *Id.* at 165.

40.     Mr. Shapiro explained that STOLI "was the whole business platform for [Simba] so it was pretty much the mantra of the company."  *Id.* at 21:16-22:9, 161:21-162:1.

41.     The transactions offered through Simba were called "Life Insurance Capacity Transactions" and involved the acquisition of life insurance policies by way of non-recourse premium financing provided by financial institutions referred to by Simba as "funders."  Exhibit A, Dep. of L. Bryan at 62:19-63:15-18, 14:6-11; Exhibit C, Dep. of P. Shapiro 25:7-13; Exhibit B, Statement of Larry Bryan at 1-5; Exhibit D, Dep. of L. Bryan II at 21:23-22:1

---

[1] Simba is a term referring to a group of entities including Simba Group and Simba Life Plans. *Id.* at 36:23-37:19.

[2] In 2007, Simba changed its name to Wealth Modes.  Exhibit A, Dep. of L. Bryan at 52:10-15.

42.     As described more fully below, and as in the *Sun Life* matter, Coventry was the funder of the Policy at issue in this case.

43.     The benefit of these transactions to funders was "the potential acquisition of high face value life insurance policies."  Exhibit B, Statement of Larry Bryan at 1, 4; *see* Exhibit C, Dep. of P. Shapiro at 72:3-6 ("Simba was in the business of bringing insureds with excess life insurance capacity together with funders who wanted those policies."); Dep. of M. Roffeld[3] at 37:24-38:7, attached hereto as Exhibit E (The funder pays the premiums because "the funder wants the policy.").

44.     The benefit of these transactions to Simba was "insurance commissions from the life insurance companies that issued the policies and cash payments from the funders based on volume of policies produced."  Exhibit B, Statement of Larry Bryan at 1.

**Simba Targeted Senior Citizens Who Did Not Actually Need Life Insurance**

45.     Simba's target audience was healthy seniors with "excess (unwanted, not needed) life insurance capacity ($2 million or more)."  *See* Exhibit F, "The Simba Group Presents: 'A Life Insurance Capacity Transaction' (The asset you never knew you had)," ("Simba Offering") at 4; Exhibit C, Dep. of P. Shapiro at 69:9-11; Exhibit B, Statement of Larry Bryan at 3.

46.     Simba targeted seniors who did not actually want or need life insurance and, in fact, in Simba's own marketing materials, it stated, "Life insurance capacity is defined as the amount of life insurance you could buy . . . but don't need, want, or plan to ever purchase." Exhibit F, Simba Offering at 2; *id.* at 4 ("Participation Requirements . . . Has Excess (unwanted, not needed) life insurance capacity"); Exhibit C, Dep. of P. Shapiro at 43:3-11 ("[T]hey did not want the insurance for their own personal use with their own money."); *see also* Exhibit A, Dep.

_____

[3] Mr. Roffeld was an insurance agent who sometimes referred business to Simba.  Exhibit E, Dep. of M. Roffeld at 10:14-11:6, 20:12-24.

of L. Bryan at 260:12-18 (Simba did not provide estate planning services); Exhibit D, Dep. of

Larry Bryan II at 22:17-23:5 ("When I used to do estate planning it was – the purpose was for

the actual covering of an estate tax.  And we would normally sit down, myself, the client's

lawyers, the personal estate planning lawyers, the client's CPA, and it would usually be a

coordinated plan, amongst the three of us, to construct a life insurance portfolio for the purposes

of covering the estate tax.  [At Simba], I never met and we never met with any body's financial

advisors to put together any kind of a financial or estate plan as it relates to taxes or what I would

call traditional planning.").

       47.     Simba enticed seniors to allow life insurance policies to be taken out on their lives

by promising that there were no out-of-pocket costs and no risks to these seniors, and that there

was a possibility that the seniors might receive financial compensation from the funders who

procured the policies.  Exhibit B, Statement of Larry Bryan at 5 ("Simba advertised our program

as totally free to our clients, and it was."); *id.* (seniors took no risk); Exhibit A, Dep. of L. Bryan

at 323:6-8 (same); Exhibit C, Dep. of P. Shapiro at 36:4-8 ("[The insured] had no . . . skin in the

game."); Exhibit E, Dep. of M. Roffeld at 39:15-31 (The insured had no risk ); Exhibit F, Simba

Offering at 2 ("There are no obligations or out of pocket expenses to [clients] when engaging in

a 'life insurance capacity transaction.'"); Agenda Simba Agent Dinner Mtg. at 1 ("**THE DEAL

IS FREE**"), attached hereto as Exhibit G.

       48.     Indeed, Simba's marketing materials enticed seniors by advertising the program

as a "free Powerball Lottery ticket" so that they could potentially hit "bingo" and win a "mini

lottery."  Exhibit G, Agenda Simba Agent Dinner Mtg. at 1.

       49.     Neither Simba nor any of the seniors who Simba and the funders enticed to allow

life insurance policies to be taken out on their lives ever paid any premiums for these policies.

Rather, all of the premiums for such policies were paid by the funders, such as Coventry, on whose behalf Simba was acting to assist the funders in procuring policies.  Exhibit C, Dep. of P. Shapiro at 241:3-12 ("[T]he business model of what Simba did was . . . none of the clients wanting to pay for hundreds of thousands of dollars for annual premiums for insurance at their ages.  None of them.  They were all on board for a number of third party financial institutions to pay for their insurance because there was a possibility that they were going to receive some sort of incentive or compensations for doing this particular transaction."); Exhibit E, Dep. of M. Roffeld at 40:17-41:3 ("[T]he only entity that has any risk in this transaction is the funder[.]"); Exhibit A, Dep. of L. Bryan at 324:13-16 ("Q: [W]ho shoulders the risk in this transaction?  Who stands to potentially lose money? A: The funder.").

### The Process of a "Life Insurance Capacity Transaction"

50.    The first step in a life insurance capacity transaction at Simba was for the senior to fill out a short application including a Health Insurance Portability and Accountability Act (HIPAA) release allowing Simba (and others) to request the client's medical records.  Exhibit F, Simba Offering at 4; Exhibit G, Agenda Simba Agent Dinner Mtg. at 1; Exhibit C, Dep. of P. Shapiro at 28:13-29:1.

51.    Once Simba received the client's medical records, Simba would send those records to whatever insurance companies Mr. Bryan's funder contacts were telling him they wanted policies from at the time in order to round out their investment portfolios.  Exhibit G Agenda Simba Agent Dinner Mtg. at 1 ("Stages of Process . . . Sending Case to Carriers for 'Informal' Offers."); Exhibit F, Simba Offering at 4 (similar); Exhibit B, Statement of Larry Bryan at 2 ("I worked with the funders to determine what sort of policies they wanted . . . . My contacts at the funders would tell me what insurance companies they wanted in order to round

out the funders' portfolios.  I would then direct Simba to apply for the types of policies that the funders were interested in on behalf of Simba's clients.").

52.     Once Simba received tentative offers from the insurers, Simba would send those offers, along with the medical records, to its network of funding entities.  Exhibit G, Agenda Simba Agent Dinner Mtg. at 1 ("Stages of the Process . . . Send Case to Multitude of Banks"); Exhibit F, Simba Offering at 4 (sending medical records to funding institutions is part of process); Exhibit C, Dep. of P. Shapiro at 28:23-29:1 ("[I]f we get that offer to be a decent offer, then we would ship the case to one of the funding companies and see if they like this case.  It would just go from there.").

53.     The medical records would be used to order/create life expectancy reports on the potential insureds.  Exhibit G, Agenda Simba Agent Dinner Mtg. at 1 ("Steps of Process . . . Ordering LE'S."); Exhibit F, Simba Offering at 4 (life expectancy reports are part of the process); Exhibit C, Dep. of P. Shapiro at 30:25-31:3 ("[W]e would send [the records] to the funding companies as well because one of the main parts of this transaction was for the funding company to get . . . a life expectancy report."); Exhibit E, Dep. of M. Roffeld at 32:9-10 (life expectancy reports were generated on every client).

54.     The funders used the life expectancy reports to determine how long the potential insureds were projected to live and thus how valuable a particular policy might be.  Dep. of P. Loy[4] at 25:7-11 ("[I]t turns out that the economic value in the policy is determined by how long [the insured] is going to live, usually mostly based on – on premium, but – and then that, in subsequent term, affects how much [a funder] is willing to pay for that policy."), attached hereto

---

[4] Phil Loy is the president and co-founder of AVS Underwriting.  Exhibit H, Dep. of P. Loy at 13-16.  AVS's business is to provide life expectancy evaluations and other services to the life settlement industry.  *Id.* at 17-18.

as Exhibit H; Exhibit C, Dep. of P. Shapiro at 31:24-32:22. ("The reason why [the funders] care [about how long an insured is projected to live] is because the funding company is paying the premiums . . .  and since the bank is paying the premium, if the client's going to live a long, long time then the bank, who's also getting the death benefit, doesn't want to pay the premium because they're not going to make any money when the client dies.  They've paid the premium for too many years. . . . . [I]f the bank pays the premium for too many years, they say, well this isn't a good case, we'll pass on this one and they'll look for another case."); Exhibit E, Dep. of M. Roffeld at 32:20-34:21 (The funders wanted to know how long a potential insured might live so they could decide whether it was a good investment to ultimately acquire).

55.     Afterwards, the funders would revert to Simba with an offer(s) or with a denial. Exhibit G, Agenda Simba Agent Dinner Mtg. at 1 ("Stages of Process . . . Await Bingo."); Exhibit C, Dep. of P. Shapiro at 34:16-18. ("They may not present anything but they may present a deal, an arrangement to go forward.").

56.     Then, Mr. Bryan would direct Mr. Shapiro and his staff which deals to accept and Simba would go ahead and make formal insurance applications on behalf of the funders.  Exhibit C, Dep. of P. Shapiro at 35:2-6 ("[The funders] would send the [offer] emails to me and then Larry and I would sit down and go over them and Larry would decide which ones he wanted to go forward with and say, you know, Peter, do this one, do that one.").

57.     The seniors/insureds were not involved in the decisional process of which life insurance policies to apply for.  Exhibit B, Statement of Larry Bryan at 3 ("No Simba client . . . ever asked [Simba] to get them a specific type of policy or a policy from a particular company."); Exhibit C, Dep. of P. Shapiro at 34:19-21 ("Q: So the funders made the decision on which life insurance application to make?  A: Yes.").

58.     Neither were the seniors/insureds involved in the decisional process of which funding arrangements Simba applied for.  Exhibit B, Statement of Larry Bryan at 4; Exhibit C, Dep. of P. Shapiro at 35:15-21 ("The insureds were involved to the point that once Larry gave me the direction of which way we were going on the financing arrangement . . . the insured knew which one they were getting at that point in the process."); *id.* at 36:15-21 ("[I]f we got more than one offer, then Larry would say we want to do the upfront or the back-end two-year deal and give me the instruction to get moving and then we would let the client know which way we were going and then we would give the case manager, you know, instructions to move forward.").

59.     Simba instructed its agents not to "[p]re sell/coach/qualify your clients on the deals . . . . If your client gets a deal, it's like a free Powerball Lottery ticket!  They should grab it & run, and thank you & us.  They should not ask you/us to get them another type of deal." Exhibit G, Agenda Simba Agent Dinner Mtg. at 1; Exhibit F, Simba Offering at 6 ("You the client do not pick ahead of time which capacity transaction you like best.  This is determined by which financial institution/institutions offer you a capacity transaction for consideration.").

60.     Mr. Shapiro testified that the seniors/insureds did not decide which insurance policies to apply for or what financing deals to participate in because the seniors/insureds were simply allowing the funders to use their bodies to acquire life insurance in exchange for the promise that there would be no risk to the seniors/insureds and that they might receive money. Exhibit C, Dep. of P. Shapiro at 36:2-10 ("The insureds couldn't make the decision.  The funders had to decide which one of the deals or what the deal was, what they wanted to pay for.  *The insured was simply part of the transaction only because the – we and the funder were using their body as the transaction.  They had no . . . skin in the game.  They had no – they weren't*

*involved in the transaction.  They were just involved in the use of their body to be part of the transaction*.") (emphasis added).

61.     The funders, including Coventry, basically offered three types of deals through Simba, namely (a) front-end deals; (b) back-end deals; and (c) hybrid deals.  Exhibit B, Statement of Larry Bryan at 1.

62.     As described more fully below, the Policy at issue in this case was a back-end deal run by Simba on behalf of Coventry.  Through this deal, Coventry, as the funder, procured the Policy from its inception.

63.     Once it was determined what deals Simba was moving forward with on behalf of its clients, Simba would show the senior/insured only the signature pages of whatever boilerplate, non-negotiable forms the funders required for their particular deal structure and then, once the signature pages were signed, Simba would send those documents back to the funder. Exhibit B, Statement of Larry Bryan at 3.

64.     Once the necessary deal structure was in place, Simba would make the formal applications to the insurance carriers selected by the funders.  Exhibit C, Dep. of P. Shapiro at 36:15-21.

65.     As discussed more fully below, Mr. Bryan's signature (at the time, he was still known as Mr. Schweiger) appears on the insurance application for the Policy at issue.

66.     Mr. Bryan would "make sure that Simba applied for the types of policies that [the funders] wanted."  Exhibit B, Statement of Larry Bryan at 4; Exhibit D, Dep. of L. Bryan II at 32:3-10 ("[I]t seemed to be the same thing from the funders end it's, hey, you know, we want American General, we want Sun Life, we want Security Life of Denver.  They would kind of let us know what is going on and we would ask them, you know, what insurance company do you

want, because it didn't pay for us to go spend our time getting an insurance policy issued from a

company that they didn't want to fund right this minute.").

**Mrs. Malkin Was Induced Into A
"Life Insurance Capacity Transaction" That Was Funded By Coventry**

67.     In 2005, Mrs. Malkin was a retired woman in her mid-seventies living in a three-

bedroom condominium in Aventura, Florida with her retired second husband Paul Malkin.

68.     That summer, the Malkins were referred to Simba by a senior citizen in Mrs.

Malkin's building by the name of Mike Sparber.  Exhibit E, Dep. of M. Roffeld at 26:11-27:1;

Exhibit A, Dep. of L. Bryan at 167:5-14, 365:4-19, 368:2-9; Exhibit C, Dep. of P. Shapiro at 64-

65; Exhibit B, Statement of Larry Bryan at 3.

69.     Mr. Shapiro (who was social with the Malkins outside of work as well) had

discussions with the Malkins early-on in the process about the Malkins' lack of need or desire for

life insurance.  Exhibit C, Dep. of P. Shapiro at 272:7-15; *see id.* at 69:15-23.

70.     The Malkins told Mr. Shapiro that they did not want or need life insurance.  *Id.* at

240:16-19; *see id.* 66:5-16 ("Q: Do you know whether the Malkins came to Simba because they

needed life insurance? A: No, they did not need life insurance. Q: . . . [D]o you know whether

the Malkins came to Simba because they wanted life insurance? A: No, they did not want life

insurance. Q: Do you know who, if anyone, did want life insurance policies on Mrs. Malkin's

life? A: No, I don't know anyone that wanted life insurance on their life except for the banks that

financed this."); *id.* at 71:7-72:6 (Mrs. Malkin could qualify for insurance coverage that Mrs.

Malkin didn't want but that some funder did want); *id.* at 76:9-16 (similar).

71.     Regardless, on August 19, 2005, Simba acquired a HIPAA release from Mrs.

Malkin in favor of itself and numerous third-parties including insurance companies and funding

entities, specifically including Coventry Financial and Coventry First, and life expectancy

- 18 -

companies, specifically including AVS.  Simba then used the HIPAA release to acquire Mrs.

Malkins' medical records from her various physicians.  HIPAA Release at 2-3, attached hereto as

Exhibit I; Exhibit C, Dep. of P. Shapiro at 82-83, 85-87.

72.     Simba then used Mrs. Malkin's medical records to make informal applications to

insurers as selected by Mr. Bryan based on his knowledge of the policies that the funders wanted

at that time.  Exhibit B, Statement of Larry Bryan at 2; Email from P. Shapiro to M. Greenberg

("Confirm that this case is being shopped to all of the companies Total [Financial] represents that

Marty G[reengerg] & Larry [Bryan] have agreed to."), attached hereto as Exhibit J.

73.     It was eventually decided by Simba and the funders on whose behalf Simba was

working, including Coventry, to acquire three policies on Mrs. Malkin's life—a $4 million

American General policy through Coventry (i.e., the Policy at issue in this case), a $5 million

Sun Life policy through Coventry (i.e., the policy declared void *ab initio* in the *Sun Life* matter),

and a $4 million American General policy procured through a different STOLI funding entity

called Sail Funding Trust II—for a total of $13 million in coverage.  Exhibit B, Statement of

Larry Bryan at 4.

74.     One Sun Life and two American General policies were applied for and procured

by funders on Mrs. Malkin's life because those were the policies the funders wanted.  *Id.*

75.     In order for Coventry to procure the Policy at issue, Simba presented Mrs. Malkin

with only the signature pages for the various boilerplate transaction documents Coventry wanted

her to sign.  Exhibit C, Dep. of P. Shapiro at 272:16-274:7; Exhibit B, Statement of Larry Bryan

at 4.

76.     The documents Coventry required to participate in its program were "not negotiable."  Exhibit B, Statement of Larry Bryan at 5; Exhibit C, Dep. of P. Shapiro at 47:2-22; Exhibit A, Dep. of L. Bryan at 264:265:21.

77.     Mr. Bryan and Mr. Shapiro have since confirmed that the documents Mrs. Malkin was asked to sign were in blank, and that she, like Simba's other clients, were told this was not a problem.  Exhibit A, Dep. of L. Bryan at 284:7-23.

78.     Throughout this process, Coventry was in complete control, and Simba and its employees and agents were acting for and on behalf of Coventry, the funder who was controlling the process.  Exhibit A, at 264:11-266:5.

79.     Not only did Coventry provide the non-negotiable forms which were used to obtain and fund this Policy, but Coventry unilaterally selected Wilmington Trust Company to serve in multiple capacities, including as trustee of two Delaware trusts Coventry established for purposes of procuring the Policy without insurable interest and for the purpose of wagering on Mrs. Malkin's life.

**The Application for and Issuance of a $4 Million Life Insurance Policy**

80.     Attached hereto as Exhibit K is the $4 million life insurance policy (i.e., the "Policy"), including the application for the Policy, issued by American General Life Insurance Company on the life of Mrs. Malkin.  (Personal identifying information has been redacted from Exhibit K.)

81.     On or about March 15, 2006, a life insurance application (the "Application") was submitted to American General Life Insurance Company, seeking a $4 million policy on the life of Mrs. Malkin.  *See* Exhibit K.

82.     At the time of the Application, Mrs. Malkin was seventy-five years old.  *Id*.

83.     The Application identified the "Phyllis Malkin Insurance Trust" (the "Malkin Trust") as the proposed owner and sole "beneficiary" of the policy," and identified Wilmington Trust Company in Delaware as the trustee of the Trust.  *Id.*

84.     Following submission of the Application, American General Life Insurance Company issued the Policy to the Trust in Delaware, as both owner and beneficiary, with a face amount of $4 million (and policy number U10019824L).

85.     The Policy expressly states: "THIS IS A DELAWARE CONTRACT."  *Id.*

86.     On March 17, 2006, Wilmington Trust Company, as the Delaware trustee of the Malkin Trust, and acting in Wilmington, Delaware, signed a form titled "Policy Acceptance and Amendment of Application" through which Wilmington Trust Company "acknowledge[d] receipt and acceptance of the [P]olicy" in Delaware.  *See* Exhibit L, Policy Acceptance and Amendment of Application form.

87.     According to Larry Bryan, Mrs. Malkin was never shown or given a copy of the Policy or the completed Application.  *See* Exhibit A, Dep. of L. Bryan 284:7-23 (regarding the fact that Ms. Malkin was caused to sign forms in blank).

88.     Consistent with Coventry's origination scheme, at or prior to the time of issuance of the Policy, a sub-trust to the Malkin Trust was created (the "Sub-Trust"), and the Sub-Trust entered into a non-recourse premium finance agreement with Coventry (under the name Coventry First, LLC) whereby Coventry would pay the premiums on the Policy during the two-year contestable period and then take formal ownership of the Malkin Trust, the Sub-Trust, and the Malkin Policy after the expiration of the contestable period.

89.     Moreover, through the terms of the Sub-Trust agreement and the financing agreement with Coventry, all interests and assets in the Malkin Trust and the Sub-Trust,

including any interests or rights in the Policy, were assigned to Coventry before the Policy was even issued.

90.     Consistent with Coventry's origination scheme, the Malkins did not pay any of the premiums for the Policy.  Exhibit B, Statement of Larry Bryan at 5 ("The Malkins, like the other Simba clients who did Coventry deals before them, paid no premium payments (or anything else for that matter) and took no risk."); Exhibit C, Dep. of P. Shapiro at 243:18-19 ("The Malkins didn't want to, as no one wanted to, pay for this insurance on their own.").

91.     Instead, the initial premium payment for the Policy originated from and was paid by Coventry, and was sufficient to keep the Policy in-force for roughly 26 months.

92.     On information and belief, approximately 26 months after the Policy was issued, Mrs. Malkin was caused to execute documents formally relinquishing to Coventry all rights, title, and interest in the Policy, the Malkin Trust, and the Sub-Trust.

93.     At that point, and on information and belief, the "loan" was deemed satisfied and Coventry installed itself as the sole owner of the Malkin Trust and the Sub-Trust.

94.     On August 4, 2008, approximately two and one-half years after issuance of the Policy and consistent with the pre-existing arrangement between Coventry and its contractual co-parties, Coventry and the Malkin Trust (which by this point was solely owned and controlled by Coventry) submitted to American General a request to change the ownership and beneficiary of the Policy from the Malkin Trust to "U.S. Bank, NA, as Securities Intermediary," "c/o Coventry First."  A copy of the August 4, 2008 ownership and beneficiary change request is attached as Exhibit M.

95.     On or around August 23, 2012, the Policy was again transferred or sold when, on that date, Wells Fargo submitted to American General a request to change the ownership and

beneficiary of the Policy from "U.S. Bank, NA, as Securities Intermediary," to "Wells Fargo Bank NA, as Securities Intermediary."  Along with this request, Wells Fargo provided American General with written authorization to permit Coventry to make inquiries about the Policy and requested that duplicate copies of all Policy-related correspondence be sent to Coventry.  A copy of the August 23, 2012 ownership and beneficiary change request is attached as Exhibit N.

96.     On information and belief, throughout this process—from the time the Policy was first put in place through the time a claim for the Policy's death benefit was made—Coventry repeatedly cashed-in on and profited from its wager on Mrs. Malkin's life.  Among other things, Coventry profited: (a) immediately upon issuance of the Policy by virtue of the fact that, shortly after Coventry paid the Policy's initial premium payment, Coventry recovered a significant portion of that amount when it received half of the commissions paid by American General; (b) when it transferred the Policy to U.S. Bank, at which time Coventry earned significant pre-negotiated fees, commissions, and other amounts from Coventry's pre-arranged purchaser; and (c) when Coventry was then engaged to "service" the Policy, for which Coventry also earned significant pre-negotiated fees, commissions, and other amounts.

### Mrs. Malkin Passes Away and Wells Fargo, as Securities Intermediary, Receives the Policy's Death Benefit

97.     Mrs. Malkin passed away on September 13, 2014.

98.     On or about October 17, 2014, Wells Fargo, as Securities Intermediary, made a claim to American General for the Policy's death benefit.

99.     On or about October 28, 2014, a check in the amount of $4,013,976.47 was issued to Wells Fargo.

100.    On information and belief, Wells Fargo, as Securities Intermediary, is holding the Policy's death benefit for the benefit of its principal.

101.     Since Mrs. Malkin's passing, the Estate has discovered that the Policy was procured by Coventry through a STOLI scheme and that, under Delaware law, the Policy lacked an insurable interest prior to and at its inception and that the Policy was merely a wager on Mrs. Malkin's life.

## FIRST CAUSE OF ACTION

### RECOVERY OF INSURANCE PROCEEDS
### DUE TO LACK OF INSURABLE INTEREST

102.     The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

103.     The Policy is controlled by and subject to Delaware law because, among other things, it expressly provides that "THIS IS A DELAWARE CONTRACT" and because the Policy was intentionally structured to be a Delaware "trust-owned insurance policy" as defined by Delaware's insurable interest statute, 18 Del. C. § 2704(e)(4).  Indeed, because the Policy was delivered to the place of business of the trustee of the Malkin Trust, Wilmington Trust Company, at its offices in Wilmington, Delaware, the existence of an insurable interest "shall be governed by [Delaware's insurable interest statute] without regard to [the] insured's state of residency or location."  18 Del. C. § 2704(g).

104.     As set forth above, according to the Eleventh Circuit Court of Appeals, the scheme through which the Policy was procured was undeniably a STOLI scheme.  *See Sun Life Assur. Co. v. United States Bank Nat'l Ass'n*, 2017 U.S. App. LEXIS 10389 (11th Cir. 2017) (citing *Sciarretta v. Lincoln Nat'l Life Ins. Co*., 778 F.3d 1205, 1207-1208 (11th Cir. 2015) (A "STOLI policy is a speculative investment device that entails gambling on the lives of the elderly.  In its purest form, a STOLI transaction works like this: A speculator secures an agreement with a person, who is usually elderly, authorizing the speculator to buy insurance on

that person's life.  The speculator usually gets the policy in the largest amount available and pays the premiums, hoping to profit in one of two ways.  One way is if the insured dies before the premiums paid exceed the death benefit.  Under that scenario the sooner the insured dies, the fewer the premium payments that are necessary to obtain the payout, and the greater the return on investment.  The other way the speculator can profit is by selling the policy to another speculator for more than the premiums paid up to the point of that sale.")).

105.    As such, under Delaware law—and as this Court and the Eleventh Circuit have already concluded concerning the same transaction through which the policy at issue in the *Sun Life* matter was procured—the Policy lacked insurable interest at its inception.  *See Sun Life Assur. Co. v. United States Bank Nat'l Ass'n*, 2017 U.S. App. LEXIS 10389 (11th Cir. 2017); *Sun Life Assur. Co. of Canada v. U.S. Bank Nat'l Ass'n*, Case No. 14-CIV-62610-BLOOM, 2016 U.S. Dist. LEXIS 4732 (S.D. Fla. Jan. 13, 2016).

106.    Indeed, the Policy lacked insurable interest because, among other things, Coventry procured the Policy on Mrs. Malkin's life and thus engaged in a STOLI scheme; and the Malkin Trust, which was the original owner and beneficiary of the Policy, was created and nominally funded by Coventry as a sham to circumvent Delaware's insurable interest requirement.  *See* 18 Del. C. § 2704 ("[N]o person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured."); *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059 (Del. 2011).

107.    Because the Policy lacked insurable interest, the Estate is entitled to an award of the Policy's entire death benefit (plus applicable interest, attorneys' fees, and other costs and

damages) from Wells Fargo, solely in its capacity as Securities Intermediary. *See* 18 Del. C. § 2704 (b) ("If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.").

**SECOND CAUSE OF ACTION – IN THE ALTERNATIVE**
**UNJUST ENRICHMENT**

108.    The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length, and sets forth this cause of action in the alternative to the Estate's preceding claim.

109.    Solely in its capacity as Securities Intermediary, Wells Fargo's acceptance and retention of the Policy's death benefit has enriched Wells Fargo and its principal, to the detriment of the Estate. Given the circumstances surrounding the procurement of the Policy, allowing Wells Fargo, as Securities Intermediary, to retain the proceeds of the Policy is inequitable and without justification including because, among other things, the Policy was procured without insurable interest by Coventry to wager on Mrs. Malkin's life, in violation of applicable law and public policy.

110.    Accordingly, the Estate is entitled to an award of the Policy's entire death benefit (plus applicable interest, attorneys' fees, and other costs and damages) from Wells Fargo, solely as Securities Intermediary.

Dated: August 17, 2017                    Respectfully Submitted,

                                          s/Martha R. Mora
                                          ─────────────────────────────
                                          Martha R. Mora, Esq.
                                          Florida Bar No. 648205
                                          Email: mmora@arhmf.com
                                          Daniel O. Mena, Esq.
                                          Florida Bar No. 059579
                                          dmena@arhmf.com
                                          **AVILA RODRIGUEZ HERNANDEZ**
                                          **MENA & FERRI LLP**
                                          2525 Ponce de Leon Blvd., PH 1225
                                          Coral Gables, FL 33134
                                          Telephone:  (305) 779-3560
                                          Facsimile:  (305) 779-3561


                                          Gregory J. Star (*pro hac* motion to be filed)
                                          Michael J. Miller (*pro hac* motion to be filed)
                                          Joseph M. Kelleher (*pro hac* motion to be filed)
                                          **DRINKER BIDDLE & REATH LLP**
                                          One Logan Square, Suite 2000
                                          Philadelphia, PA 19103-6996
                                          Telephone:  (215) 988-2700
                                          Facsimile:  (215) 988-2757

                                          *Attorneys for the Estate of Phyllis M. Malkin*