UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-23136-Civ-COOKE/LOUIS

ESTATE OF PHYLLIS M. MALKIN,
*By its Personal Representative, Toni Ellen Guarnero*,

    Plaintiff,

vs.

WELLS FARGO BANK, N.A.,
*as Securities Intermediary*, and BERKSHIRE
HATHAWAY LIFE INSURANCE
COMPANY OF NEBRASKA,

    Defendants.
_____/

## ORDER DENYING MOTION TO DISMISS

THIS MATTER is before me on Defendant Berkshire Hathaway Life Insurance Company of Nebraska's Motion to Dismiss the Amended Complaint ("Motion") (ECF No. 118). The Motion is fully briefed and ripe for review. For the reasons set forth herein, the Motion is denied.

### I. BACKGROUND

I recently observed in a separate matter that "[c]ases involving stranger-originated life insurance (or 'STOLI') policies usually involve the same set of facts." *Wilmington Tr., N.A. v. Lincoln Benefit Life Co.*, 2018 U.S. Dist. LEXIS 162010, at *2 (S.D. Fla. Sept. 20, 2018). That is particularly true here. The policy at issue in this case was one of three policies taken out on the life of Phyllis Malkin. One of those policies has already been the subject of litigation before Judge Beth Bloom in the Southern District of Florida, *Sun Life Assurance Co. of Canada v. U.S. Bank Nat'l Ass'n*, 2016 U.S. Dist. LEXIS 4732 (S.D. Fla. Jan. 13, 2016), and Judge Bloom's "thorough and well-reasoned orders" in that case were largely affirmed by the Court of Appeals for the Eleventh Circuit. 693 F. App'x 838, 840 (11th Cir. 2017). In the interest of judicial economy, I refer to Judge Bloom's orders for the broader factual context of this case, and recite only the allegations specific to the policy at issue here.

On or about March 15, 2006, a life insurance application (the "Application") was submitted to American General Life Insurance Company ("American General"), seeking a $4-million policy on the life of Phyllis Malkin. *Am. Compl.*, ECF No. 88, at ¶ 82. Ms. Malkin was in her mid-seventies at the time, and was retired and living in Aventura, Florida, with her husband. *Id.* at ¶¶ 68, 83. The Application identified the "Phyllis Malkin Insurance Trust" (the "Malkin Trust") as the proposed owner and sole beneficiary of the Policy, and it identified Wilmington Trust Company in Delaware as the trustee of the Malkin Trust. *Id.* at ¶ 84. American General subsequently issued a policy to the Malkin Trust in Delaware, with a face amount of $4 million (the "Policy"). *Id.* at ¶ 85. The Policy states: "THIS IS A DELAWARE CONTRACT." *Id.* at ¶ 86. On March 17, 2006, Wilmington Trust Company signed a form titled "Policy Acceptance and Amendment of Application," by which it "acknowledge[d] receipt and acceptance of the [P]olicy" in Delaware. *Id.* at ¶ 87. It is alleged that Ms. Malkin was never shown or given a copy of either the completed Application or the Policy itself. *Id.* at ¶ 88.

Around the time the Policy was issued, a sub-trust to the Malkin Trust was also created (the "Sub-Trust"). *Id.* at ¶ 89. The Sub-Trust entered into a non-recourse premium finance agreement with Coventry First LLC ("Coventry"), whereby Coventry would pay the premiums on the Policy during the two-year contestable period, and then take formal ownership of the Malkin Trust, the Sub-Trust and the Policy after the contestable period ended. *Id.* Through the terms of the Sub-Trust agreement and the financing agreement with Coventry, all interests and assets in the Malkin Trust and the Sub-Trust, including any interests or rights in the Policy, were assigned to Coventry. *Id.* at ¶ 90. Ms. Malkin did not pay any of the premiums for the Policy. *Id.* at ¶ 91. Instead, the initial premium payment for the Policy was paid by Coventry, and was sufficient to keep the Policy in effect for about 26 months. *Id.* at ¶ 92. When that period expired, Ms. Malkin executed documents formally relinquishing to Coventry all rights, title and interest in the Policy, the Malkin Trust and the Sub-Trust. *Id.* at ¶¶ 93–94.

On August 4, 2008, about two and one-half years after the Policy was issued, Coventry and the Malkin Trust submitted to American General a request to change the ownership and beneficiary of the Policy from the Malkin Trust to "U.S. Bank, NA, as

Securities Intermediary," "c/o Coventry First." *Id.* at ¶ 95. On or about August 23, 2012, the Policy was again transferred after Wells Fargo submitted to American General a request to change the ownership and beneficiary of the Policy from "U.S. Bank, NA, as Securities Intermediary," to "Wells Fargo Bank NA, as Securities Intermediary." *Id.* at ¶ 96. Along with that request, Wells Fargo provided American General with written authorization to permit Coventry to make inquiries about the Policy, and it requested that duplicate copies of all Policy-related correspondence be sent to Coventry. *Id.*

Ms. Malkin passed away on September 13, 2014. *Id.* at ¶ 98. On or about October 17, 2014, Wells Fargo made a claim to American General for the Policy's death benefits. *Id.* at ¶ 99. On or about October 28, 2014, American General issued a check to Wells Fargo in the amount of $4,013,976.47, as payment of the death benefits. *Id.* at ¶ 100. At some point thereafter, Wells Fargo transferred that amount to Berkshire Hathaway Life Insurance Company of Nebraska ("Berkshire"). *Id.* at ¶ 101; *Mot.*, ECF No. 118, at p. 3.

Ms. Malkin's estate (the "Estate") brought this action against Wells Fargo on August 17, 2017. *Compl.*, ECF No. 1. After learning that Berkshire had received the Policy's death benefits, the Estate sought and obtained leave to amend its Complaint and add Berkshire as a defendant. *Endorsed Omnibus Order*, ECF No. 89. The Amended Complaint alleges two causes of action against Wells Fargo and Berkshire. *Am. Compl.*, ECF No. 88, at ¶¶ 104–12. The first count, against both Defendants, is for recovery of the Policy's death benefits pursuant to Delaware's insurable interest statute, Del. Code Ann. tit. 18, § 2704(b). *Id.* at ¶¶ 104–09. The second count, also against both Defendants, is for recovery of the benefits under a theory of unjust enrichment. *Id.* at ¶¶ 110–12.

In the instant Motion, Berkshire argues that both counts of the Amended Complaint should be dismissed with prejudice. *Mot.*, ECF No. 118, at pp. 3–5. Berkshire argues that "[t]he Estate's claims are barred because Ms. Malkin—on whose behalf the Estate is asserting these claims—relinquished all of her rights and interest in the Policy." *Id.* at p. 4. Alternatively, Berkshire argues that count two, the unjust enrichment claim, should be dismissed because "the Estate cannot allege that it has conferred any direct benefit on Berkshire." *Id.* at p. 5.

## II. LEGAL STANDARDS

### A. Motions to dismiss

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss[.]" *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016). The court can also "consider a document attached to a motion to dismiss" if it is "(1) central to the plaintiff's claim and (2) undisputed." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

### B. Delaware's insurable interest law

"Delaware law explicitly provides that an individual may not procure an insurance policy on the life of another without an insurable interest in the insured's life." *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *51 (citing Del. Code tit. 18, § 2704(a)). An insurable interest is defined, for persons who are not close relatives, as "a lawful and substantial economic interest in having the life, health or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the individual insured[.]" Del. Code tit. 18, § 2704(c)(2). The Delaware Supreme Court has held that "if a life insurance policy lacks an insurable interest at inception, it is void *ab initio* because it violates Delaware's clear public policy against wagering." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1067–68 (Del. 2011).

Delaware's insurable interest statute also creates a right of action. Specifically, the statute provides: "If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them." Del. Code Ann. tit. 18, § 2704(b).

### C. Unjust enrichment

Under Delaware law, "[u]njust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec*, 991 A.2d at 1130.

### III. DISCUSSION

In its Motion, Berkshire does not deny that the Policy at issue in this case was indeed a STOLI policy—in other words, that it was "a speculative investment device that entail[ed] gambling on the li[fe] of [an] elderly" person. *Sun Life*, 693 F. App'x at 840 (quoting *Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1207–08 (11th Cir. 2015)). Nor does Berkshire choose to "address whether . . . Delaware law applies to determine the validity of the Policy." *Mot.*, ECF No. 118, at p. 3 n.2. Not denying that Delaware law applies, Berkshire implicitly admits that the STOLI policy in this case was void *ab initio*, so that "no insurance policy ever legally came into effect[.]" *Price Dawe*, 28 A.3d at 1067–68. Despite these admissions, Berkshire believes that it—not the estate of the insured Ms. Malkin, nor, apparently, the insurer American General—should keep the money that it received when Ms. Malkin passed away.

Berkshire's principal argument in support of its keeping the money is that "Ms. Malkin decided to relinquish the . . . Policy in satisfaction of the loan" that she had received from Coventry to pay the Policy's premiums. *Reply in Supp.*, ECF No. 126, at p. 2. Thus, Coventry legally "acquired" the Policy, which eventually made its way to Berkshire. *Id.* In line with that argument, Berkshire attaches to its Motion a copy of the release form in which Ms. Malkin purported to "fully relinquish . . . all rights, interests, powers, privileges and benefits created under or reserved to [her] in the Trust and Sub-Trust, including all assets of the Trust estate and the Sub-Trust estate[.]" *Mot.*, ECF No. 118, at p. 2. Berkshire then proceeds to cite a host of cases for the uncontroversial proposition that a validly executed release is legally binding. *Id.* at p. 5.

What Berkshire is asking the Court to do is accept the very ruse that was already rejected by Judge Bloom in a related case. In determining that one of the other two policies on Ms. Malkin's life was a STOLI policy, Judge Bloom noted that Coventry had "dictated every aspect of the transaction," and that Ms. Malkin "was simply the conduit" for a wager on her life. *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *64. One of the key aspects of the transaction dictated by Coventry was that "[Ms.] Malkin was to satisfy her obligations under the loan by either paying Coventry the balance of the loan, or 'relinquishing to [Coventry] all of [her] right, title and interest in, to and under [the insurance policies]." *Id.* at *17. In other words, the ultimate transfer of the Policy from the insured to a third party was the whole point of the scheme. *See id.* at *11 ("[n]early all the deals" organized by Coventry and its partner Simba "were back-end deals where the insured later relinquished the policy to Coventry"); *Wilmington Tr.*, 2018 U.S. Dist. LEXIS 162010, at *2 (STOLI cases "usually involve the same set of facts," including "the third party acquir[ing] the policy when the insured purposefully defaults on the loan").

Delaware's insurable interest law reflects the reality that the "payee" under a typical STOLI policy is not the insured herself, but a third party to whom the rights under the policy have been transferred or relinquished. Del. Code Ann. tit. 18, § 2704(b). It is precisely in that situation that the statute creates a right of action, despite the fact that, as here, the insured relinquished her contractual right to the policy's benefits—indeed, despite the fact the insurance contract was void *ab initio*, so the insured had no contractual right to relinquish at all. *See Price Dawe*, 28 A.3d at 1067–68. Simply put, the statute reflects a policy determination that it is better in such cases for the insurance money to wind up with the insured's loved ones than with the strangers who gambled on her life. *Cf. Beard v. Am. Agency Life Ins. Co.*, 550 A.2d 677, 686 n.3 (Md. 1988) (noting that Maryland's nearly identical statute imposes a "sanction" on those who receive payment of insurance proceeds despite lacking an insurable interest).

Here, Berkshire argues that Ms. Malkin "expressly relinquished" not only her rights under the insurance contract, but also "her right under section 2704(b)." *Reply in Supp.*, ECF No. 126, at p. 2. Berkshire contends that the "plain language" of the release form signed by Ms. Malkin covered her right to bring suit under the statute. *Id.* at p. 6. The Court declines

to interpret the release form in a manner that is so contrary to "Delaware's clear public policy," *Price Dawe*, 28 A.3d at 1068—particularly where the form made no mention of the statute, and where there is little reason to believe that Ms. Malkin even read the form before signing it. *See, e.g.*, *Am. Compl.*, ECF No. 88, at ¶¶ 77–78 (the terms of the Coventry contracts were "not negotiable," and the forms Ms. Malkin signed were "blank"). To hold that Ms. Malkin gave up her rights under Delaware's insurable interest statute by signing a "boilerplate, non-negotiable form[]," *id.* at ¶ 64, would allow entities like Coventry to defeat the statute's intent with the same type of "feign[ed] technical compliance" that characterizes STOLI schemes in general. *Price Dawe*, 28 A.3d at 1074.

Berkshire fares no better in arguing for dismissal of the Estate's alternative claim of unjust enrichment. Berkshire's sole argument for dismissal of count two is that Ms. Malkin and the Estate conferred no "direct benefit" on Berkshire. *Reply in Supp.*, ECF No. 126, at pp. 8–9. Berkshire argues that such direct conferral is an element of unjust enrichment in each of the three jurisdictions—Texas, Nebraska and Florida—whose law could plausibly govern the Estate's claim. *Id.* at p. 8 n.7. Berkshire does not, however, venture to pick which one of those three bodies of law should apply, nor does it articulate any specific reason why Delaware law should *not* apply, apart from saying "there is simply no scenario" in which it could. *Id.* What is more, the Texas and Nebraska cases that Berkshire cites do not support its reading of the law in those jurisdictions. *See David O. Kemp, P.C. v. Nationwide Agribusiness Ins. Co.*, 2012 WL 13019688, at *3 (N.D. Tex. June 12, 2012) (making no mention of direct conferral, and noting that unjust enrichment can be construed as a claim for "money had and received," which is "less restricted and fettered by technical rules and formalities than any other form of action" and is "solely" focused on "whether the defendant holds money, which . . . belongs to the plaintiff"); *Lamb v. ITT Corp.*, 2010 WL 376858, at *6 (D. Neb. Jan. 26, 2010) (making no mention of direct conferral, and noting that unjust enrichment is a claim of equity, which "is not a rigid concept" and "looks through forms to substance"). In any event, Berkshire argues alternatively that "even if" Delaware law did govern count two, the claim would still fail. *Id.* at p. 8.

Given this rather unhelpful briefing on the choice-of-law issue, the Court will examine count two using the law under which it is brought—the law of Delaware. Under

7

Delaware law, a claim of unjust enrichment requires a showing of: " (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec*, 991 A.2d at 1130. Taking the facts in the Amended Complaint to be true, *see Iqbal*, 556 U.S. at 678, the Estate has sufficiently alleged that Berkshire was enriched, and the Estate impoverished, by Berkshire's unjustified retention of money to which the Estate is entitled. True, Delaware's insurable interest statute does provide a legal remedy, so the fifth element is arguably lacking. But it is conceivable that if the Estate's claim under count one failed, the fifth element would then be met. The Estate argues that this is the proper function of an alternative claim, *Resp. in Opp'n*, ECF No. 123, at p. 18, and Berkshire has provided no compelling reason to hold otherwise.

## IV. CONCLUSION

For all of the reasons set forth above, it is hereby **ORDERED and ADJUDGED** that Defendant Berkshire Hathaway Life Insurance Company of Nebraska's Motion to Dismiss the Amended Complaint (ECF No. 118) is **DENIED**.

**DONE and ORDERED** in Chambers, in Miami, Florida, this 11th day of January 2019.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Lauren Louis, U.S. Magistrate Judge*
*Counsel of record*