# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 17-23136-Civ-COOKE/LOUIS

ESTATE OF PHYLLIS M. MALKIN,
*By Its Personal Representative, Toni Ellen Guarnero*,

     Plaintiff,

vs.

WELLS FARGO BANK, N.A.,
*As Securities Intermediary*, and BERKSHIRE
HATHAWAY LIFE INSURANCE
COMPANY OF NEBRASKA,

     Defendants.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before me on the Motions for Summary Judgment filed by Defendant Wells Fargo Bank, N.A. ("Wells Fargo") (ECF Nos. 77, 136); the Motion for Summary Judgment filed by Defendant Berkshire Hathaway Life Insurance Company of Nebraska ("Berkshire") (ECF No. 133); and the Motion for Summary Judgment filed by Plaintiff Estate of Phyllis M. Malkin ("the Estate") (ECF No. 138). All of the motions are fully briefed and ripe for the Court's review.

## I. BACKGROUND

I have previously noted that the factual background of this case overlaps with that of another case from the Southern District of Florida. *Order Denying Mot. to Dismiss*, ECF No. 174, at p. 1. That case was *Sun Life Assurance Co. of Canada v. U.S. Bank Nat'l Ass'n*, 2016 U.S. Dist. LEXIS 4732 (S.D. Fla. Jan. 13, 2016) ("*Sun Life*"). Like the instant case, *Sun Life* centered around one of three insurance policies taken out on the life of Phyllis Malkin. 2016 U.S. Dist. LEXIS 4732, at *13–14. In *Sun Life*, Judge Beth Bloom determined that the policy before her was a stranger-originated life insurance ("STOLI") policy, and that it was consequently void *ab initio* under Delaware law. *Id.* at *65–66.

1

As Judge Bloom wrote in *Sun Life*, a STOLI policy is one that "lacks an insurable interest at inception and is procured for the purpose of re-sale to investors on the secondary market[.]" *Id.* at *2–3. While the instant case involves a different policy from the one in *Sun Life*, I refer to Judge Bloom's decision for the broader factual context of both cases, including her discussion of the STOLI market and the businesses involved in it. *See id.* at *2–12. For purposes of this Order, it is sufficient to note that one of the businesses involved in the STOLI market in South Florida was Simba, founded by Larry Bryan. *Id.* at *4–11; *see also Estate's Stmt. of Facts* ("*ESOF*"), ECF No. 135, at ¶¶ 10–57. Also involved were certain entities that the Estate refers to collectively as "Coventry." *ESOF* at ¶¶ 1–2.[1]

Furthermore, as will be clear from the summary that follows, even the more specific facts of this case are virtually indistinguishable from those in *Sun Life*. The policies in the two cases were issued only one month apart from each other in early 2006. *ESOF* at ¶¶ 115–18. The applications for both policies, and their financing, were "overwhelmingly arranged and governed" by "Coventry, along with its right hand, Simba." *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *63–64. And both policies were ultimately transferred to Coventry, which then sold them to third-party investors. *ESOF* at ¶¶ 121–45.

---

[1] In its Response to the Estate's Statement of Facts, Berkshire objects to the use of "Coventry" as a shorthand for these entities, whose individual names are Coventry First LLC, Coventry Capital I LLC, and so on. *See ESOF* at ¶¶ 1–2; *Berkshire's Resp. to ESOF* ("*BRESOF*"), ECF No. 144, at ¶ 1. Indeed, in that one filing alone, Berkshire insists that "'Coventry' is not a legal entity" nearly three dozen times. Berkshire suggests that such use of shorthand constitutes an improper application of the "group pleading doctrine" or of an "alter ego theory" of corporate standing. *See Berkshire's Resp. to Estate's Mot. for Summ. J.*, ECF No. 145, at p. 12 n.8. Of course, those doctrines have nothing to do with this case. *See, e.g.*, *Sides v. Simmons*, 2008 WL 11412070, at *3 (S.D. Fla. Aug. 12, 2008) ("[T]he group pleading doctrine. . . . allows a plaintiff to allege a securities fraud claim based on a company publication against all high ranking officials of that corporation without fear of dismissal under the particularity requirement of F.R.C.P. 9(b).").

More generally, Berkshire has misused its Response to "dispute" virtually every factual point made by the Estate, without regard to whether those points are actually in controversy. To take just one example, the Estate asserts that "[o]n October 29, 2014, Wells Fargo credited the full amount of the death benefit [equaling $4,013,976.47] to an account it maintained on behalf of Berkshire." *ESOF* at ¶ 147. Berkshire responds that this factual claim is: "Disputed. On October 29, 2014, Wells Fargo credited the $4,013,976.47 to Berkshire's securities account." *BRESOF* at ¶ 147. By reflexively denying almost every factual assertion made by the Estate, Berkshire has done nothing more than transfer to the Court the "laborious process [of] attempt[ing] to determine what is actually disputed." *Gomez v. Target Corp.*, 2017 WL 3601806, at *1 (S.D. Fla. Aug. 2, 2017).

The only significant difference between this case and *Sun Life* lies in what happened after Ms. Malkin passed away. In *Sun Life*, the insurer refused to pay the policy's death benefit and filed suit against the investor, seeking a declaration that the policy was a STOLI policy and therefore void under Delaware's insurable interest law. *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *33–34. Here, by contrast, the insurer paid out the policy's $4-million death benefit to Wells Fargo, which was acting as a securities intermediary for Berkshire. Thus, it is Ms. Malkin's Estate that brings this suit against Berkshire and Wells Fargo, seeking to recover the policy's death benefit under a separate provision of the same Delaware law. *See* Del. Code Ann. tit. 18, § 2704(b).

In short, while the facts here are the largely the same as in *Sun Life*, the nature of the Estate's claim is different, as are the defenses that Berkshire and Wells Fargo assert.

### A. Phyllis Malkin's entry into the life insurance market

In 2005, Phyllis Malkin and her husband Paul were retired and living in Aventura, Florida, when an acquaintance referred them to Simba. *ESOF* at ¶ 58; *Amend. Compl.*, ECF No. 88, at ¶ 68. The evidence indicates that Ms. Malkin "did not need" and "did not want" life insurance prior to meeting with Simba. *ESOF* at ¶¶ 59–60. Neither did she express any interest in paying for such insurance. *Id.* at ¶ 63. Rather, Ms. Malkin and her husband were told that Simba could offer them a "risk free opportunity to make money." *Id.* at ¶ 61.

On August 19, 2005, Ms. Malkin provided Simba with a release form allowing it access to her medical records. *Id.* at ¶¶ 64–65. Coventry then used those records to generate a life expectancy report for Ms. Malkin, which, in turn, it used to determine how valuable any policies on her life might be. *Id.* at ¶¶ 67–68.

After receiving approval from American General Life Insurance Company ("AIG") and Sun Life, stating that they would issue policies on Ms. Malkin's life, Simba confirmed that Coventry was interested in the policies. *Id.* at ¶ 69. Eventually, three separate policies were taken out on Ms. Malkin's life: the $4-million AIG policy at issue here ("the Policy"); the $5-million policy at issue in *Sun Life* ("the Sun Life Policy"); and another $4-million policy procured through a separate entity called Sail Funding Trust II. *Id.* at ¶ 70; *Amend. Compl.*, ECF No. 88, at ¶ 74. Ms. Malkin, who until 2005 had not been in the market for life insurance, thus obtained a total of $13 million in coverage.

### B. Ms. Malkin's applications for the policies, the financing of the policies and the creation of the Trust

Coventry acted as the program administrator and servicing agent of a life insurance premium financing program known as Premium Finance Plus ("PFP"), in connection with LaSalle Bank. *ESOF* at ¶ 73. In that capacity, on or about February 16, 2006, Coventry approved a non-recourse premium finance loan for the Sun Life Policy. *Id.* at ¶ 74.

To move the process forward, Coventry required Ms. Malkin to fill out various forms. *Id.* at ¶ 77. These documents were "not negotiable." *Id.* at ¶ 78. On or about March 2, 2006, Ms. Malkin executed a document in which she appointed Coventry as her attorney-in-fact, with full authority to originate, service or liquidate "any life insurance policies on [her] life[.]" *Id.* at ¶ 79. Ms. Malkin's husband also executed a form granting Coventry similar powers to act in his stead. *Id.* at ¶ 80.

Also on March 2, 2006, Ms. Malkin executed a PFP loan application form with LaSalle Bank, and with Coventry as the program administrator for LaSalle Bank. *Id.* at ¶ 83. The Malkins also executed a form providing that a trust was going to be established to hold insurance policies on Ms. Malkin's life. *Id.* at ¶ 84.

In early March 2006, Coventry noted internally that it was "hoping to add" another policy on top of the Sun Life Policy, and that this would be a $4-million policy from AIG—the Policy at issue in this case. *Id.* at ¶ 85.

On March 15, 2006, the Malkins entered into an agreement with Wilmington Trust Company to create a Delaware statutory trust with an initial trust estate of $1, for the express purpose of applying for and holding insurance policies on Ms. Malkin's life ("the Trust"). *Id.* at ¶ 87. Ms. Malkin was designated the settlor, Wilmington Trust Company the trustee, and Mr. Malkin the beneficial owner and co-trustee. *Id.*

Also on March 15, 2006, Ms. Malkin signed applications for both the Sun Life Policy and the Policy at issue here. *Id.* at ¶ 92. Both applications listed the Trust as the proposed owner, beneficiary and premium payor of the policies. *Id.* at ¶ 93. Larry Bryan, Simba's founder, has stated that Ms. Malkin did not make the decision to apply for coverage from either Sun Life or AIG. *Id.* at ¶ 94.

The evidence indicates that Coventry's initial plan was for the Sun Life Policy and the Policy to be funded under a single PFP loan, which would be entered into by a single sub-trust to the Trust. *Id.* at ¶ 97. On or around March 16, 2006, Ms. Malkin signed an agreement to create such a sub-trust ("the Sub-Trust"), which would enter into a note and security agreement with Coventry and LaSalle Bank, pursuant to which the Sub-Trust would borrow money to pay premiums and hold any life insurance policy until the loan was repaid or the policy was relinquished. *Id.* at ¶ 98.

However, by April 6 or 7, 2006, Coventry changed its plan of funding both policies under a single loan, and ultimately each policy was funded under a separate but identical loan. *Id.* at ¶ 99. In order to create a second loan transaction, the Malkins and Wilmington Trust entered into another agreement instructing Wilmington Trust to establish a second sub-trust ("the Sun Life Sub-Trust"). *Id.* at ¶ 100. The Sub-Trust was used to enter the PFP loan for the Policy, and the Sun Life Sub-Trust was used to enter the PFP loan for the Sun Life Policy. *Id.* at ¶ 101.

Around this time, Ms. Malkin and LaSalle Bank entered into a "Settlor Non-Recourse Security Agreement" that was applicable to the Sub-Trust, and a separate but identical agreement that was applicable to the Sun Life Sub-Trust. *Id.* at ¶ 103. These agreements provided that Ms. Malkin pledged and assigned to Coventry and LaSalle Bank a security interest in the Trust, the Sub-Trust and the Sun Life Sub-Trust, along with all their assets. *Id.* at ¶ 104. The agreements further provided that the loans entered into by the sub-trusts would be non-recourse to Ms. Malkin. *Id.*

Around the same time, the Sub-Trust, LaSalle Bank and Coventry (as program administrator for LaSalle Bank) entered into a 26-month, non-recourse "Note and Security Agreement" in the principal amount of $264,895.87, in order to fund the Policy ("the Loan"). *Id.* at ¶ 105. According to Coventry's internal records from April 7, 2006, the Loan was to be funded that day, and the Sun Life Policy would be "issued [the] next week, but [was] no longer under the same loan" as the Policy, and thus Coventry needed "to send new trust docs, same info, for the [Sun Life] policy." *Id.* at ¶ 106.

Thus, on May 25, 2006, the Sun Life Sub-Trust, LaSalle Bank and Coventry (again as program administrator) entered into a non-recourse "Note and Security Agreement" in

the principal amount of $238,050, in order to fund the Sun Life Policy ("the Sun Life Loan"). *Id.* at ¶ 107. Like the Loan, the Sun Life Loan would mature after a period of 26 months. *Id.* at ¶¶ 108–09. After 26 months, the total amount due on the Loan would be $360,265.34, while the total amount due on the Sun Life Loan would be $340,496.41. *Id.* at ¶¶ 110–11; *BRESOF* at ¶ 110.

## C. The issuance and delivery of the policies

On or about March 16, 2006, AIG issued the Policy to Wilmington Trust, as trustee for the Trust, in Wilmington, Delaware. *ESOF* at ¶ 115. Scott A. Huff, a Senior Financial Services Officer, signed a "Policy Acceptance Acknowledgement" form in Wilmington, Delaware, on March 17, 2006. *Id.*; *Estate's Ex. 45*, ECF No. 137-12, at p. 2. The Policy states: "THIS IS A DELAWARE CONTRACT." *ESOF* at ¶ 116.

Similarly, Sun Life delivered the Sun Life Policy to Wilmington Trust, as trustee for the Trust, in Wilmington, Delaware. *Id.* at ¶ 118. Wilmington Trust acknowledged receipt of the Sun Life Policy in Wilmington, Delaware, on April 20, 2006. *Id.*

On April 7, 2006, Coventry paid the initial premiums to AIG on the Policy. *Id.* at ¶ 117. Mr. Bryan, Simba's founder, has confirmed that the Malkins did not pay any premiums in relation to either the Policy or the Sun Life Policy. *Id.* at ¶ 119.

## D. Ms. Malkin's relinquishment of the policies to Coventry

On June 16, 2008, Coventry sent a "Notice of Foreclosure of Collateral" to the Sub-Trust, informing it that the outstanding balance of $360,265.34 on the Loan for the Policy had been due by June 9, 2008, and that the Sub-Trust was in default. *Id.* at ¶ 120. The notice stated that Coventry was going to "foreclose upon and sell or otherwise liquidate" the Policy unless Ms. Malkin paid the entire Loan amount plus additional interest. *Id.*

Around that time, Ms. Malkin signed a "Premium Finance Plus Election Notice." *Id.* at ¶ 121. That document indicated that the Sub-Trust, as the borrower under the Loan, would satisfy the outstanding balance of $360,265.34 on the Loan by "[r]elinquishing all right, title an[d] interest in and to the [Policy]." *Id.*

On or around June 20, 2008, Mr. Malkin executed a resignation letter as co-trustee of the Trust, while Ms. Malkin signed an "Irrevocable Settlor Instruction Letter." *Id.* at ¶

122. The latter document instructed Wilmington Trust to relinquish all rights, interests and powers in relation to the Trust and any sub-trust to Coventry. *Id.* at ¶ 123. The document also provided that Wilmington Trust would cancel the trust certificate in the name of Ms. Malkin's husband and "issue a new Trust Certificate and Sub-Trust Certificate in the name of the Servicing Agent," which was Coventry. *Id.* at ¶ 124.

On or around July 24, 2008, one Coventry entity (Coventry Capital I LLC) sold the Policy to another (Coventry First LLC) for $280,000. *Id.* at ¶ 126. On or around August 1, 2008, Coventry First LLC, U.S. Bank and yet another Coventry entity known as LST I LLC entered into a "Tripartite Entitlement Order." *Id.* at ¶ 127. Through that document, the Policy was transferred to LST I LLC. *Id.* at ¶ 128. U.S. Bank then submitted ownership and beneficiary change forms to AIG, requesting that the owner and beneficiary of the Policy be changed to U.S. Bank, as securities intermediary for LST I LLC. *Id.*

As with the Policy and the Loan, on July 28, 2008, Coventry wrote a letter to the Sun Life Sub-Trust informing it that the outstanding balance of $340,496.41 on the Sun Life Loan had been due by July 25, 2008, and that the Sun Life Sub-Trust was in default. *Id.* at ¶ 129. On or around August 5, 2008, Mr. Malkin executed another copy of the resignation letter as co-trustee of the Trust, and Ms. Malkin executed another copy of the "Irrevocable Settlor Instruction Letter," this time in connection with the Sun Life Policy. *Id.* at ¶ 130. As with the Policy, Coventry Capital I LLC sold the Sun Life Policy to Coventry First LLC for $255,000. *Id.* at ¶ 132.

### E. Coventry's sale of the policies to third parties

In September 2012, the owner and beneficiary of the Policy was changed from U.S. Bank, as securities intermediary, to Wells Fargo, as securities intermediary. *Id.* at ¶ 134. When Wells Fargo became the owner and beneficiary of the Policy, it did so on behalf of Coventry and LST Holdings Ltd. *Id.* at ¶ 135.

In June 2013, Wells Fargo entered into a contract with Berkshire for the purposes of Berkshire's purchase of life insurance policies. *Id.* at ¶ 136. Berkshire then acquired the Policy, along with approximately 124 other policies, by executing a purchase agreement with Coventry and LST Holdings Ltd. *Id.* at ¶ 137. In that agreement, Berkshire received a representation by Coventry that to its knowledge none of the policies "was originated in

connection with a STOLI transaction." *Id.* at ¶ 138. Under the agreement, Wells Fargo was to serve as securities intermediary for both the seller of the Policy (LST Holdings Ltd.) and the purchaser (Berkshire). *Id.* at ¶ 139.

In connection with the agreement, Berkshire paid Coventry $322,103 for the Policy, and it subsequently made total premium payments to AIG of $137,194.20. *Id.* at ¶ 145.

The Sun Life Policy was also transferred to a third party. On August 18, 2008, U.S. Bank executed ownership and beneficiary change request forms asking Sun Life to change the Sun Life Policy's record owner and beneficiary from the Trust to U.S. Bank, as securities intermediary for AIG. *Id.* at ¶ 133; *BRESOF* at ¶ 133; *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *28–29.

### F.  Payment of the Policy's death benefit to Berkshire

On September 13, 2014, Ms. Malkin passed away. *Id.* at ¶ 146. On October 27, 2014, AIG issued a check to Wells Fargo in the amount of $4,013,976.47, as payment of the Policy's death benefit. *Id.* On October 29, 2014, Wells Fargo credited that full amount to the securities account that it maintained on behalf of Berkshire. *Id.* at ¶ 147. Berkshire then transferred the proceeds to another account that it maintained at Wells Fargo. *Id.* at ¶ 148.

### G.  The *Sun Life* case and this case

Unlike AIG, "Sun Life refused to pay the death benefits due under the [Sun Life] Policy" to the policy's owner, U.S. Bank. *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *33. In November 2014, Sun Life brought suit in the Southern District of Florida, seeking a declaration that the Sun Life Policy was a STOLI policy and was therefore void. *Id.* at *33–34. On January 13, 2016, Judge Beth Bloom issued an order on the parties' motions for summary judgment. *Id.* at *75. Judge Bloom found that the Sun Life Policy was governed by Delaware law, *id.* at *46–47, and that the Sun Life Policy "lacked an insurable interest at its inception and was clearly a disguised wager on the life of Phyllis Malkin." *Id.* at *75. On appeal, Judge Bloom's "thorough and well-reasoned orders" were largely affirmed by the Eleventh Circuit Court of Appeals. 693 F. App'x 838, 840 (11th Cir. 2017).

On August 17, 2017, Ms. Malkin's Estate filed the instant lawsuit, originally against Wells Fargo only. *Compl.*, ECF No. 1. The Estate sought to recover the Policy's proceeds

pursuant to subsection (b) of Delaware's insurable interest statute. *Id.* at ¶¶ 102–07. In the alternative, it sought recovery under a theory of unjust enrichment. *Id.* at ¶¶ 108–10.

Wells Fargo notified Berkshire of the Estate's Complaint by email on November 3, 2017. *ESOF* at ¶ 153. On November 17, 2017, Wells Fargo and Berkshire demanded that Coventry and LST Holdings Ltd. indemnify them in connection with the Estate's claims. *Id.* at ¶ 154. When Coventry and LST Holdings declined this demand, Wells Fargo filed a third-party complaint against various Coventry entities, seeking indemnification for itself and Berkshire. *Wells Fargo's 3d-Party Compl.*, ECF No. 21. On May 24, 2018, Wells Fargo dismissed that third-party complaint with prejudice. *Stip. of Dismissal*, ECF No. 65.

On July 3, 2018, the Estate filed its Amended Complaint, adding Berkshire as a defendant. *Amend. Compl.*, ECF No. 88; *see also Endorsed Omnibus Order*, ECF No. 89.

## II. SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* In reviewing a motion for summary judgment, the court is "required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1143 (11th Cir. 2007)).

## III. DISCUSSION

All three Parties have moved for summary judgment. The Estate, in its motion, argues that the Court should apply Delaware law in interpreting the Policy, and that under Delaware law the Policy is void *ab initio* as a STOLI policy—in other words, that the Policy was an illegal wager on the life of Phyllis Malkin. *Estate's Mot. for Summ. J.*, ECF No. 138, at pp. 4–5. The Estate therefore argues that it is entitled to recover the Policy's death benefit under subsection (b) of Delaware's insurable interest statute. *Id.* at p. 5. According to the Estate, that statute "precludes—*without exception and as a matter of public policy*—STOLI

investors from retaining the death benefit of a life insurance policy manufactured through a STOLI scheme." *Id.*

Berkshire asserts an array of defenses in its own motion for summary judgment. "First and foremost," Berkshire contends that it is "immunized from this suit" as a bona fide purchaser for value under the Uniform Commercial Code ("UCC"). *Berkshire's Mot. for Summ. J.*, ECF No. 133, at pp. 1–2. Second, Berkshire argues that the Estate's claim against it under the insurable interest statute is barred by Delaware's three-year statute of limitations for statutory claims. *Id.* at p. 2. Third, Berkshire argues that Ms. Malkin relinquished any right her Estate had to the Policy's death benefit, both under the Policy itself and under the insurable interest statute. *Id.* at pp. 2, 14–17. Fourth, Berkshire denies that the Policy here was a STOLI policy at all. *Id.* at p. 2. Finally, Berkshire argues that the Estate's alternative claim of unjust enrichment fails because the Estate did not "confer[] any direct benefit on Berkshire, which is a required element of that claim." *Id.*

Wells Fargo, for its part, has filed two motions for summary judgment.[2] In those motions, Wells Fargo adopts each of the Berkshire defenses outlined above, apart from the statute of limitations defense. *Wells Fargo's 2d Mot. for Summ. J.*, ECF No. 136, at pp. 1–2. Wells Fargo also asserts an additional defense of its own—namely, that Wells Fargo enjoys further protection from suit under the UCC, due to its "ministerial role" as a securities intermediary. *Id.* at pp. 3–4; *Wells Fargo's 1st Mot. for Summ. J.*, ECF No. 77, at p. 3.

For the reasons set forth below, the Court rules on the Parties' motions as follows: 1) the Estate's principal claim against Berkshire and Wells Fargo, brought under a Delaware statute, is governed by Delaware law; 2) the Policy in this case, like the one in *Sun Life*, is a STOLI policy; 3) Ms. Malkin did not relinquish her Estate's statutory right to the Policy's proceeds; 4) Berkshire and Wells Fargo's affirmative defenses based on the UCC fail as a matter of law; 5) the Estate's statutory claim is not time-barred; 6) the Estate is entitled to recover the Policy's proceeds; and 7) the Estate's alternative claim of unjust enrichment fails because an adequate legal remedy is available.

---

[2] Wells Fargo's successive motions are permissible under the Local Rules, which state that a party may "fil[e] both a motion for summary judgment asserting an immunity from suit and a later motion for summary judgment addressing any issues that may remain in the case." S.D. Fla. L.R. 7.1(c)(2).

### A. The Estate's statutory claim is governed by Delaware law

As I have noted, the facts of this case and of *Sun Life* are virtually the same, with both cases involving insurance policies taken out on the life of Phyllis Malkin during a one-month period in 2006. *ESOF* at ¶¶ 115–18. Both cases also share the same "critical," core issue: whether their respective policies were STOLI policies and therefore void under Delaware law. *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *34. Nevertheless, there is one important difference between this case and *Sun Life*. The types of claims brought by the plaintiffs in the two cases are distinct, as a result of the divergent courses of action taken by the two insurers after Ms. Malkin passed away.

In *Sun Life*, the insurance company refused to pay the Sun Life Policy's $5-million death benefit to the policy's owner, U.S. Bank. 2016 U.S. Dist. LEXIS 4732, at *33–34. Instead, the insurer brought suit, seeking (and obtaining) a declaration that the Sun Life Policy violated Delaware's insurable interest statute and was therefore void. *Id.* at *3–4. Here, by contrast, the insurance company that issued the Policy is not a party to this suit—AIG paid out the Policy's $4-million death benefit to the Policy's owner Berkshire, evidently without a fight. *ESOF* at ¶ 146–48. Instead, it is Ms. Malkin's Estate that brings suit, seeking to recover the death benefit from Berkshire under subsection (b) of the insurable interest statute, which creates a right of action under these circumstances.

In short, while the plaintiff-insurer's claim in *Sun Life* was "unequivocally" a contract claim, the Estate's claim in this case is just as clearly a *statutory* one, brought under a specific provision of the Delaware Code. *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *35. The Parties appear to recognize this, at least for certain purposes. *See, e.g.*, *Berkshire's Mot. for Summ. J.*, ECF No. 133, at pp. 2, 11 (arguing that "the Estate's statutory claim" falls outside Delaware's three-year limitations period for an "action based on a statute"). For the most part, however, the Parties have briefed this case as one sounding in contracts, and they urge the Court to conduct a choice-of-law inquiry on that basis, just as Judge Bloom did in *Sun Life*. *See, e.g.*, *id.* at p. 3; *Estate's Mot. for Summ. J.*, ECF No. 138, at pp. 7–8.

Under the unique circumstances presented here, and for the limited purposes of this Order, the Court does not find that a choice-of-law inquiry is necessary. Simply put, this is not a contract case to be governed by the law of one state or another, depending on where

the contract was executed. For one thing, the Estate does not claim here that it has any contractual rights under the Policy. Nor could it—if the Estate's claim is correct, "there is no contract at all." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1065–67 (Del. 2011) (under Delaware law, a STOLI policy "is void as against public policy and thus never comes into force"). What is more, even if a valid contract existed, Ms. Malkin signed papers "[r]elinquishing all right, title an[d] interest in and to" that contract. *ESOF* at ¶¶ 121–24. Thus, if the Policy were valid, it would be the Policy's purchaser and owner Berkshire—not Ms. Malkin's Estate—that would have a contractual right to the Policy's proceeds.

To be sure, much of this was also true of the plaintiff-insurer's claim in *Sun Life*. And the plaintiff there also generally relied on Delaware's insurable interest statute—indeed, the statute provides the starting point for any Delaware STOLI case. *See* 2016 U.S. Dist. LEXIS 4732, at *51–53. Unlike the *Sun Life* plaintiff, however, the Estate here gains nothing by merely nullifying the Policy. Rather, the Estate's only hope for relief in this case is found in a specific subsection of the insurable interest statute, subsection (b), which establishes its right of action and governs every element of its claim. Subsection (b) provides as follows:

> If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

Del. Code Ann. tit. 18, § 2704(b).

A contract is "made in violation of" the insurable interest statute when it is a STOLI policy, as defined in the statute:

> Any individual of competent legal capacity may procure or effect an insurance contract upon his or her own life or body for the benefit of any person, but no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.

Del. Code Ann. tit. 18, § 2704(a).

Finally, the statute states that it "applies to all insurance contracts . . . other than . . . [p]olicies or contracts not issued for delivery in [Delaware] nor delivered in [Delaware]."

Del. Code Ann. tit. 18, § 2701(2). The statute specifically provides that "a trust-owned life insurance policy, if delivered to the place of business in Delaware of the trustee of said trust[,] shall be deemed to have been delivered in [Delaware]." Del. Code Ann. tit. 18, § 2704(g). And the statute further states that "[t]he existence of an insurable interest with respect to . . . [a] trust-owned life insurance policy shall be governed by this section without regard to an insured's state of residency or location." *Id.*

In short, while Delaware's insurable interest statute was central to the analysis in *Sun Life*, here the statute itself is the vehicle by which the Estate has brought its claim. The statute establishes the Estate's cause of action, it sets a bright-line rule for what contracts it covers, and it defines the terms of the Estate's success or failure. Under these circumstances, it is not necessary to conduct a choice-of-law inquiry in order to determine that Delaware law governs the Estate's claim.

Nevertheless, the Court must determine whether in fact the Policy here falls within the Delaware statute's ambit. That question bears some similarity to Florida's fact-intensive *lex loci contractus* test, but it is simpler. Under the Florida test, "while the place of delivery of the policy *may* be the place that the policy was deemed to be executed [and whose law therefore governs], it is not *necessarily* the place that the policy was executed." *Nat'l Tr. Ins. Co. v. Graham Bros. Const. Co.*, 916 F. Supp. 2d 1244, 1252 (M.D. Fla. 2013). By contrast, Delaware's insurable interest statute applies to all contracts issued for delivery in Delaware or delivered in Delaware. Del. Code Ann. tit. 18, § 2701(2).

There is no question that the statute applies here. The Policy in this case was issued for delivery in Delaware, and it was delivered in Delaware. On or about March 16, 2006, AIG issued the Policy to Wilmington Trust, as trustee for the Trust, in Wilmington, Delaware. *ESOF* at ¶ 115. The next day, a Senior Financial Services Officer named Scott A. Huff signed a "Policy Acceptance Acknowledgement" form in Wilmington, Delaware, "acknowledg[ing] receipt and acceptance of the policy[.]" *Id.*; *Estate's Ex. 45*, ECF No. 137-12, at p. 2. Apart from the dates, these are precisely the same circumstances presented in *Sun Life*, where Judge Beth Bloom found that the Sun Life Policy was "indisputably" delivered and accepted in Delaware. 2016 U.S. Dist. LEXIS 4732, at *21–22, 39 (noting

that delivery in Delaware was "confirm[ed]" by a "'Delivery Form' . . . signed by Scott A. Huff, Senior Financial Services Officer on April 20, 2006 at 'Wilmington, DE'").

Berkshire argues that the Policy was delivered in Florida, relying on an affidavit by Simba's founder Larry Bryan. *Berkshire's Resp. to Estate's Mot. for Summ. J.*, ECF No. 145, at pp. 6–7. Mr. Bryan states that at the time AIG issued the Policy, he "was authorized by AIG to sell life insurance policies on its behalf." *Berkshire's Ex. M*, ECF No. 144-13, at ¶ 3. Mr. Bryan further states that "[i]n [his] experience as an agent for AIG, AIG would send an issued policy to [him] in Florida." *Id.* at ¶ 5. Mr. Bryan "would, in turn, make copies and send the original to the insured and the policyowner." *Id.* Mr. Bryan states that he has "no reason to believe that this practice did not occur with respect to the Policy" in this case. *Id.*

Mr. Bryan's equivocal statement about his past "practice" does not change the fact that the Policy here was delivered in Delaware. Even assuming that his actions in this case conformed with his practice, Mr. Bryan was acting as "an agent for AIG." The fact that AIG "sen[t the] issued policy" to its agent in Florida does not mean the Policy was "delivered" there. Put another way, AIG did not "deliver" the Policy to its agent. *See Terra Nova Ins. Co. v. Nanticoke Pines, Ltd.*, 743 F. Supp. 293, 295–96 & n.4 (D. Del. 1990) (under Delaware law, whether a broker's receipt of an insurance policy constitutes delivery depends on whether the broker is acting as an agent for the insurer or the insured). Rather, delivery occurred when the insurer AIG, or its agent Mr. Bryan, "sen[t] the original [Policy] to the insured and the policyowner"—the latter being the Trust in Delaware, care of its trustee Wilmington Trust. *See* Del. Code Ann. tit. 18, § 2704(g) ("[A] trust-owned life insurance policy, if delivered to the place of business in Delaware of the trustee of said trust[,] shall be deemed to have been delivered in [Delaware].").

In sum, the Policy here was delivered in Delaware, and Delaware's insurable interest statute therefore applies. The next, critical question is whether the Policy here was "made in violation of" the statute—in other words, whether the Policy is a STOLI policy under Delaware law. Del. Code Ann. tit. 18, § 2704(b).

### B.  The Policy in this case is a STOLI policy under Delaware law

As has been noted throughout this Order, the facts in this case are almost totally aligned with those in *Sun Life*. The applications for the Policy and for the Sun Life Policy,

together with their financing, were "overwhelmingly arranged and governed" by "Coventry, along with its right hand, Simba." *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *63–64. Before Ms. Malkin applied for the policies, she granted Coventry the power to originate, service and liquidate "any life insurance policies on [her] life." *ESOF* at ¶¶ 79–82. Both the Policy and the Sun Life Policy were owned by the same Trust, and both were financed through 26-month non-recourse loans. *Id.* at ¶¶ 87–114. Neither Ms. Malkin nor her husband ever paid the premiums for either the Policy or the Sun Life Policy. *Id.* at ¶¶ 117–19. And ultimately, Ms. Malkin relinquished her rights under both policies in order to satisfy the balances of their respective premium finance loans. *Id.* at ¶¶ 105–08, 120–33.

Indeed, these facts are not just identical to those in *Sun Life*—they are also "the same set of facts" presented in countless other STOLI cases. *Wilmington Tr., N.A. v. Lincoln Benefit Life Co.*, 2018 U.S. Dist. LEXIS 162010, at *2 (S.D. Fla. Sept. 20, 2018) ("[In a typical STOLI case], a senior citizen applies for and receives a life insurance policy. Then, the insured secures financing for the monthly premiums from a third party using the policy as collateral. Finally, the third party acquires the policy when the insured purposefully defaults on the loan."). On the basis of these shared facts, Judge Bloom determined that the Sun Life Policy "lacked an insurable interest at its inception and was clearly a disguised wager on the life of Phyllis Malkin." 2016 U.S. Dist. LEXIS 4732, at *75.

Here, Berkshire boasts of disputing "nearly one hundred and forty of the Estate's one hundred and sixty four so-called . . . statements of fact." *Berkshire's Resp. to Estate's Mot. for Summ. J.*, ECF No. 145, at p. 2; *see also supra* note 1. But Berkshire does not meaningfully deny the factual similarity between this case and *Sun Life*. Instead, Berkshire argues, in effect, that *Sun Life* was wrongly decided. Thus, Berkshire emphasizes that "the sole, named beneficiary of the Trust was Ms. Malkin's husband, Paul Malkin," and that Mr. Malkin would have received the Policy's death benefit "if Ms. Malkin had died at any time between the Policy's issuance through June 2008[.]" *Berkshire's Mot. for Summ. J.*, ECF No. 133, at p. 18, 21. As further evidence of this, Berkshire points to an agreement the Malkins entered into, laying out their plans for what to do with the Policy proceeds if indeed Ms. Malkin passed away while her husband was still the beneficiary. *Id.* at p. 18.

15

Berkshire claims that the parties in *Sun Life* failed to bring this "case-dispositive" point to Judge Bloom's attention. *Id.* at p. 1. "In the *Sun Life* [c]ase," Berkshire claims, the "parties argued—and the court therefore considered and addressed—whether the policy at issue was procured by Ms. Malkin or by third parties who did not have insurable interest in her life." *Id.* at p. 21. Berkshire goes on: "The court in the *Sun Life* case did *not* address whether . . . , even if a third party procured the policy, . . . there was insurable interest because the beneficiary of the policy at inception had insurable interest in the life of the insured." *Id.* (emphasis added).

That is an outright misrepresentation of the record and holding in *Sun Life*. In fact, the defendant in *Sun Life* argued, exactly as Berkshire does here, that "the insurable interest requirement was satisfied" because "at the time [Ms.] Malkin applied for the [Sun Life] Policy, her husband, Mr. Malkin, had an insurable interest in her life," and "Mr. Malkin was the ultimate beneficiary of . . . the [Sun Life] Policy until the [Sun Life] Policy was sold in 2008[.]" 2016 U.S. Dist. LEXIS 4732, at *55; *see also U.S. Bank's Resp. to Sun Life's Mot. for Summ. J.*, Case No. 14-cv-62610, ECF No. 98, at p. 13 (pointing out that "if [Ms.] Malkin died prior to the sale of the [Sun Life] Policy in 2008, her husband and her children would have received the death benefit").

Berkshire's key argument was thus squarely raised in *Sun Life*, contrary to Berkshire's representation to this Court. And the argument was just as squarely rejected. Judge Bloom held in *Sun Life* that the fact that "Mr. Malkin was the ultimate beneficiary" under the Sun Life Policy until 2008, and that the Malkins actually "received coverage for two years," was "irrelevant" to the STOLI inquiry. 2016 U.S. Dist. LEXIS 4732, at *55, 65. Indeed, the fact that Coventry would have "los[t] the wager" if Ms. Malkin had died in the first two years of the Policy was simply "part and parcel of the gamble." *Id.* at *65.

Incidentally, Judge Bloom also rejected Berkshire's other key argument, namely that it was not a "foregone conclusion that Ms. Malkin would relinquish the Policy," and that she was free to repay the Loan and keep the Policy for herself. *Berkshire's Mot. for Summ. J.*, ECF No. 133, at pp. 21–22 & n.13; *cf. Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *65 (noting that U.S. Bank "attempts to obscure" matters by arguing that Ms. Malkin "was not bound to sell the [Sun Life] Policy to Coventry at the end of the [Sun Life] Loan").

In rejecting U.S. Bank's, now Berkshire's, arguments, Judge Bloom explained that the critical question under Delaware's insurable interest law is "not what the formal consequences are of obtaining a life insurance policy." *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *65. Rather, "[t]he question must always be who procured the policy," and in answering that question "courts look to who paid the premiums." *Id.* at *54, 65; *see also Price Dawe*, 28 A.3d at 1075 ("To determine who procured the policy [under Delaware law], we look at who pays the premiums.").

In *Sun Life*, the evidence was "clear . . . that neither [Ms.] Malkin nor any other individual or entity with an insurable interest in [Ms.] Malkin's life was responsible for the premium payments on the [Sun Life] Policy." 2016 U.S. Dist. LEXIS 4732, at *61. Rather, "the entity that allowed [Ms.] Malkin to obtain the [Sun Life] Policy by providing her with the financial means to do so was the same entity that dictated the deal from its inception and ultimately purchased the [Sun Life] Policy"—namely, Coventry. *Id.* at *62. As has been stressed, the operative facts in this case are identical to those in *Sun Life*, and Judge Bloom's reasoning applies here with full force. *See, e.g.*, *Estate's Ex. 5*, ECF No. 135-5, at p. 6 (Simba's founder stating that "[t]he Malkins, like the other Simba clients who did Coventry deals before them, paid no premium payments (or anything else for that matter)").

Finally, if there were any doubt about the soundness of *Sun Life*'s ruling, that doubt would be extinguished by the Eleventh Circuit's decision on appeal, which affirmed in all relevant parts Judge Bloom's "thorough and well-reasoned orders." *Sun Life*, 693 F. App'x at 840. In fact, the same arguments that Berkshire claims were not raised in *Sun Life* were raised not only before Judge Bloom but also before the Eleventh Circuit, and to no avail. *See Brief for U.S. Bank*, *Sun Life*, 693 F. App'x 838, 2016 WL 4417366, at *39–40 (arguing that "an insurable interest existed at the time that the [Sun Life] Policy was applied for and issued" because Ms. Malkin's "husband [w]as the ultimate beneficiary").

To sum up, the Policy in this case, like the Sun Life Policy, is a STOLI policy under Delaware law. As such, the Policy was "made in violation of" Delaware's insurable interest statute, and the Estate is therefore entitled "to recover [the] benefits" from the "payee[s]" under the Policy—here, Berkshire and Wells Fargo—unless the latter's affirmative defenses hold. Del. Code Ann. tit. 18, § 2704(b).

### C. Ms. Malkin did not relinquish her Estate's right to the Policy proceeds

The most straightforward of Berkshire and Wells Fargo's affirmative defenses is that Ms. Malkin "voluntarily relinquished" her Estate's right to bring this action against them. *Berkshire's Mot. for Summ. J.*, ECF No. 133, at p. 2. Berkshire and Wells Fargo argue that "when [Ms. Malkin] elected to relinquish the [P]olicy in satisfaction of the premium finance loan," that "relinquishment" extended to the Estate's right to recover the Policy's proceeds under subsection (b) of Delaware's insurable interest statute. *Id.* at pp. 2, 14–17; *see also Wells Fargo's 2d Mot. for Summ. J.*, ECF No. 136, at pp. 1–2 (adopting Berkshire's argument as its own, without the need for "additional analysis").

I have already addressed this argument in denying Berkshire's motion to dismiss, where it was first raised:

> The Court declines to interpret [Ms. Malkin's] release form in a manner that is so contrary to "Delaware's clear public policy," *Price Dawe*, 28 A.3d at 1068—particularly where the form made no mention of the [insurable interest] statute, and where there is little reason to believe that Ms. Malkin even read the form before signing it. *See, e.g.*, *Am. Compl.*, ECF No. 88, at ¶¶ 77–78 (the terms of the Coventry contracts were "not negotiable," and the forms Ms. Malkin signed were "blank"). To hold that Ms. Malkin gave up her rights under Delaware's insurable interest statute by signing a "boilerplate, non-negotiable form[]," *id.* at ¶ 64, would allow entities like Coventry to defeat the statute's intent with the same type of "feign[ed] technical compliance" that characterizes STOLI schemes in general. *Price Dawe*, 28 A.3d at 1074.

*Order Denying Mot. to Dismiss*, ECF No. 174, at pp. 7–8.

No evidence has come to light that would cast any doubt on that ruling. The Court therefore finds as a matter of law that Ms. Malkin did not relinquish her Estate's right to recover the Policy's death benefit under Delaware's insurable interest statute.

### D. Berkshire and Wells Fargo's UCC-based defenses fail as a matter of law

Berkshire and Wells Fargo's "foremost" defenses are based on Delaware's Uniform Commercial Code. *Berkshire's Mot. for Summ. J.*, ECF No. 133, at pp. 1–2. Thus, Berkshire argues that its position here is that of a bona fide purchaser for value—in other words, that "Berkshire acquired the [P]olicy for value . . . and had no knowledge of any potential adverse claim[.]" *Id.* Wells Fargo argues that it, too, is "protected under the Delaware UCC

as a bona fide purchaser." *Wells Fargo's 2d Mot. for Summ. J.*, ECF No. 136, at pp. 3–4. Wells Fargo adds that it enjoys further "protections afforded to securities intermediaries" under the same statutory framework. *Id.* at p. 3. In short, both Berkshire and Wells Fargo assert that Delaware's UCC "completely immunizes" them "from any liability in this case." *Wells Fargo's 1st Mot. for Summ. J.*, ECF No. 77, at p. 3.

Section 8-502 of Delaware's UCC[3] provides that "[a]n action based on an adverse claim to a financial asset, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against a person who acquires a security entitlement under Section 8-501 for value and without notice of the adverse claim." Del. Code Ann. tit. 6, § 8-502. Meanwhile, section 8-501 states in relevant part that "a person acquires a security entitlement if a securities intermediary: (1) indicates by book entry that a financial asset has been credited to the person's securities account; [or] (2) . . . acquires a financial asset for the person and . . . accepts it for credit to the person's securities account[.]" Del. Code Ann. tit. 6, § 8-501(b).

Regarding securities intermediaries, section 8-115 states that apart from certain exceptions "[a] securities intermediary that has transferred a financial asset pursuant to an effective entitlement order . . . is not liable to a person having an adverse claim to the financial asset[.]" Del. Code Ann. tit. 6, § 8-115. Section 8-116 further provides, in relevant part, that "[a] securities intermediary that receives a financial asset and establishes a security entitlement to the financial asset in favor of an entitlement holder is a purchaser for value of the financial asset." Del. Code Ann. tit. 6, § 8-116.

The rules, definitions and exceptions only spiral outward from there. As a result, the Parties devote a substantial portion of their motion papers to arguing whether the Policy in this case was a "financial asset," whether it was a "security entitlement," whether Berkshire and Wells Fargo had "notice of an adverse claim"—indeed, whether "the Estate has an 'adverse claim'" at all. *Berkshire's Mot. for Summ. J.*, ECF No. 133, at pp. 5–10; *Estate's Resp. to Berkshire's Mot. for Summ. J.*, ECF No. 147, at pp. 11–16.

---

[3] Berkshire and Wells Fargo rely on Delaware's UCC but note that "the UCC provision in all other potentially applicable states is identical" to Delaware's, so "the analysis will be the same regardless of which state's law applies." *Berkshire's Mot. for Summ. J.*, ECF No. 133, at p. 5 n.3; *see also Wells Fargo's Resp. to Estate's Mot. for Summ. J.*, ECF No. 149, at p. 2 n.3.

With regard to Berkshire and Wells Fargo's shared defense, the fact that the Policy is void *ab initio* under Delaware law means that they are very likely *not* bona fide purchasers. *See Pruco Life Ins. Co. v. Brasner*, 2011 WL 13117063, at *10 (S.D. Fla. Nov. 14, 2011) (holding, in another STOLI case involving Wells Fargo, that "the bona fide purchaser for value defense fails because the policy is void *ab initio*," so that it "never [went] into effect" and the purported purchaser "never took valid title"), *vacated on other grounds sub nom. Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.*, 846 F.3d 1188 (11th Cir. 2017); *Conestoga Tr. Servs.*, 263 F. Supp. 3d at 703–04 ("Once the policy has been tainted as a wagering contract, subsequent assignees take no greater rights in the policy than the initial wagerer[.]").

The Court need not wade into such complexity, however, because even if the UCC's terms were met here, the UCC would pose no barrier to the Estate's claim. To be sure, section 8-502 of Delaware's UCC gives protection to bona fide purchasers, without any explicit exception for STOLI policies, or any other nod to Delaware's "immense public policy against wagering contracts." *Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *70–71. But that is not surprising, given that the section has been uniformly adopted across multiple states. *See supra* note 3. Far more significant, in the Court's view, is the fact that Delaware's insurable interest statute takes no notice of the UCC, and makes no exception for bona fide purchasers. As the Estate contends, the statute appears on its face to "preclude[]—*without exception and as a matter of public policy*—STOLI investors from retaining the death benefit of a life insurance policy manufactured through a STOLI scheme." *Estate's Mot. for Summ. J.*, ECF No. 138, at p. 5.

Nevertheless, Berkshire and Wells Fargo argue that the text of the insurable interest statute implies that it is intended to give way to defenses like those embodied in the UCC. Specifically, Berkshire and Wells Fargo rely on the statute's provision that "an insured (or his executor or administrator) '*may*' bring an action . . . to recover the death benefits" under a STOLI policy. *Berkshire's Resp. to Estate's Mot. for Summ. J.*, ECF No. 145, at pp. 23–24 (emphasis added). The use of the word "may," according to this reading, means that recovery under the statute is "not automatic" but "subject to all defenses available to the defendant." *Id.* at p. 21.

There are two problems with this reading. First, it places too much weight on a single word. After all, as the Estate points out, one can hardly imagine the statute saying that the insured or her estate "must" bring suit. *See Estate's Resp. to Berkshire's Mot. for Summ. J.*, ECF No. 147, at p. 18 n.10 ("[T]he vast majority of STOLI schemes and policies go uncovered, so of course the statute could not *require* that an insurer or an estate bring a claim." (emphasis added)). Even more importantly, Berkshire and Wells Fargo's reading would gut the statute's effectiveness. All that would be required for STOLI policies to yield profits to investors would be for the policies' procurers to bundle them and sell them wholesale to third-parties, who could then disclaim any awareness of the policies' origins—in other words, precisely what happened here. *See ESOF* at ¶¶ 136–38.

The Court also takes guidance here from the Delaware Supreme Court's landmark decision in *Price Dawe*. *Cf. Sun Life*, 2016 U.S. Dist. LEXIS 4732, at *53 ("*Price Dawe* is controlling and guides this Court's inquiry."). *Price Dawe* involved, among other issues, a standoff between Delaware's insurable interest law and another Delaware statute requiring incontestability clauses in all insurance contracts. *See* 28 A.3d at 1064–68. The question was whether Delaware insurance policies could be challenged as STOLIs at any time, despite legally mandated contract provisions limiting the period of contestability to two years. *Id.* That question was not altogether different from the one here, where Berkshire and Wells Fargo contend that they acquired the Policy several years after any "wrongdoing" occurred, and that they are thus entitled to enjoy the fruits of their lawful investment. *Wells Fargo's 1st Mot. for Summ. J.*, ECF No. 77, at p. 2; *cf.* 28 A.3d at 1066 (noting that incontestability clauses "essentially serve the same function as statutes of limitation and repose").

The *Price Dawe* court answered the question before it in unmistakable terms: "[I]f a life insurance policy lacks an insurable interest at inception, it is void *ab initio* because it violates Delaware's clear public policy against wagering. It follows, therefore, that if no insurance policy ever legally came into effect, then neither did any of its provisions, including the statutorily required incontestability clause." 28 A.3d at 1067–68.

*Price Dawe* all but answers the question before this Court. While that case did not involve the specific statutory provision at issue here, the text of subsection (b) is entirely aligned with the spirit of *Price Dawe.* At its core, *Price Dawe* reaffirmed the unsavory truth

about STOLI policies: they are nothing more or less than a bet that a stranger will die. *See id.* at 1065; *Grigsby v. Russell*, 222 U.S. 149, 154 (1911) (Justice Holmes observing that "[a] contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter interest in having the life come to an end"). *Price Dawe* held that in Delaware, at least, such bets never pay off.

Subsection (b) puts that promise into effect under the circumstances presented here. Subsection (b) provides that if the "payee" under a STOLI policy is someone other than the "insured or . . . her executor or administrator," then the latter may bring suit "to recover [the] benefits." Del. Code Ann. tit. 18, § 2704(b). The provision makes no exception for "payee[s]" who are bona fide purchasers, and this Court does not believe that the Delaware Supreme Court would fashion such an exception if given the opportunity. *See Towne Realty, Inc. v. Safeco Ins. Co. of Am.*, 854 F.2d 1264, 1269 n.5 (11th Cir. 1988) ("[W]hen considering a diversity case under state law, [federal courts] are bound to decide the case the way it appears the state's highest court would."). Based on *Price Dawe*, it appears that Delaware's highest court would hold that subsection (b) means exactly what it says: as between the insured's loved ones and the strangers who sought to profit from her death, the former have the better claim to the insurance money, regardless of the latter's status under the UCC.

The same reasoning applies to Wells Fargo's unique defense based on its "ministerial role" as a securities intermediary. *Wells Fargo's 2d Mot. for Summ. J.*, ECF No. 136, at pp. 3–4. To the extent that Wells Fargo, after receiving the Policy proceeds, merely passed them on in full to Berkshire, Wells Fargo would appear to have no liability under subsection (b). *See, e.g.*, *Wells Fargo's 1st Mot. for Summ. J.*, ECF No. 77, at p. 6. On the other hand, if Wells Fargo retained any of the proceeds for itself, then it is very much a "payee under [a] contract made in violation" of the insurable interest statute. Del. Code Ann. tit. 18, § 2704(b). The factual question of which entity maintains "custody and control" over the proceeds appears to be disputed, *ESOF* at ¶¶ 147–48, and the Court does not resolve it here. But as to whether Wells Fargo's purported status under the UCC protects it from suit under Delaware's insurable interest statute, the Court answers that question in the negative.

For all of these reasons, the Court determines that Berkshire and Wells Fargo's UCC-based defenses fail as a matter of law.

22

### E. The Estate's statutory claim is not time-barred

The final defense asserted against the Estate's statutory claim is asserted by Berkshire alone. Berkshire notes that although the Estate filed its original Complaint against Wells Fargo on August 17, 2017, the Estate did not file its Amended Complaint, listing Berkshire as a defendant, until July 3, 2018—more than three years after Berkshire's receipt of the Policy's proceeds on October 29, 2014. *Berkshire's Mot. for Summ. J.*, ECF No. 133, at p. 11. Berkshire therefore contends that the Estate's statutory claim against it is barred under Delaware's three-year statute of limitations for "action[s] based on a statute." *Id.* (quoting Del. Code Ann. tit. 10, § 8106(a)).

Berkshire acknowledges that Wells Fargo did, in fact, "notif[y] Berkshire of the Estate's original complaint by email on November 3, 2017." *ESOF* at ¶ 153; *cf. BRESOF* at ¶ 153 (claiming this fact is "[d]isputed" before stating in the very next sentence: "Berkshire first learned of this action on November 3, 2017, upon receipt of an email from Wells Fargo"). Thus, Berkshire received notice of the Estate's action within the grace period allowed for by the "relation-back" rules under both federal and Delaware law. *See* Fed. R. Civ. P. 4(m), 15(c) (allowing for relation back of amended pleading where conditions are met within 90 days after original pleading is filed); Del. Super. Ct. Civ. R. 4(j), 15(c) (same, where conditions are met within 120 days).

Nevertheless, Berkshire argues that one of the conditions for relation back of the Amended Complaint was not met here. Specifically, Berkshire argues that "there can be no relation back . . . because . . . the Estate did not make a 'mistake concerning the identity of the proper party.'" *Berkshire's Mot. for Summ. J.*, ECF No. 133, at p. 12 (quoting Del. Super. Ct. Civ. R. 15(c)); *see also Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010) ("Where an amended pleading changes a party or a party's name, [Federal Rule 15(c)] requires, among other things, that 'the party to be brought in by amendment . . . knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.'" (quoting Fed. R. Civ. P. 15(c)(1)(C))).

Before turning to the merits of this contention, the Court must determine whether the federal or Delaware state rules apply. In its opening motion papers, Berkshire initially claimed that the Court was required to apply Delaware's rules without any inquiry at all.

Berkshire asserted that "[f]ederal courts sitting in diversity apply the relation-back rules of state law where, as here, state law provides the statute of limitations for the action." *Berkshire's Mot. for Summ. J.*, ECF No. 133, at p. 11 (citing *Richmond Manor Apts., Inc. v. Certain Underwriters at Lloyd's London*, 2010 WL 11507006, at *4 (S.D. Fla. Oct. 18, 2010)).

Once again, Berkshire was simply misstating the law. Indeed, the very case cited by Berkshire refutes its claim. In *Richmond Manor Apts.*, the court correctly stated the law as follows: "Rule 15(c)(1) [of the Federal Rules of Civil Procedure] *allows* federal courts sitting in diversity to apply relation-back rules of state law where . . . state law provides the statute of limitations for the action." 2010 WL 11507006, at *4 (emphasis added) (quoting *Saxton v. ACF Indus., Inc.*, 254 F.3d 959, 963 (11th Cir. 2001)). "Nevertheless, [t]he state's relation-back rules are *only applied if more liberal than the federal rule*." 2010 WL 11507006, at *4 (emphasis added) (internal quotation marks and citations omitted); *see also, e.g.*, *Abernathy v. Dewey*, 277 F. Supp. 3d 129, 137–38 (D. Mass. 2017) ("[I]n effect, Rule 15(c)(1)(A) 'cements in place a one-way ratchet; less restrictive state relation-back rules will displace federal relation-back rules, but more restrictive state relation-back rules will not.'" (quoting *Morel v. DaimlerChrysler AG*, 565 F.3d 20, 26 (1st Cir. 2009))).

In its reply papers, Berkshire has adopted a different, if somewhat paradoxical, approach. Berkshire now argues that the Court should apply Delaware's relation-back rule because that rule is "more generous" than the federal rule, given the "more liberal 120-day period" in which to meet its conditions. *Berkshire's Reply in Supp. of Mot. for Summ. J.*, ECF No. 153, at p. 10. It is plain enough that Berkshire is not pushing for Delaware's rule to be applied because it is "more generous" to Berkshire's adversary. Nor is the Estate in need of the extra 30 days Delaware's rule affords. *See BRESOF* at ¶ 153 ("Berkshire first learned of this action on November 3, 2017," 78 days after the original Complaint was filed). Rather, Berkshire is pushing for Delaware's rule to apply because it is decidedly stricter on the only issue in contention: whether the Estate's failure to include Berkshire in the original Complaint was due to a "mistake concerning the identity of the proper party." *Berkshire's Mot. for Summ. J.*, ECF No. 133, at p. 12 (quoting Del. Super. Ct. Civ. R. 15(c)).

Delaware "has traditionally followed the '*strict* approach' to what a mistake under Rule 15(c) means." *Difebo v. Bd. of Adjustment of New Castle Cty.*, 132 A.3d 1154, 1158 (Del.

2016) (emphasis added). Under that approach, "a mistake occurs when the [plaintiff] makes a true mistake as to the identity or name of the proper party as opposed to where the plaintiff merely chose the wrong party to sue." *Id.* (quoting *CCS Inv'rs, LLC v. Brown*, 977 A.2d 301, 313 (Del. 2009)). Thus, "Delaware's approach as to what constitutes mistake under Rule 15(c) turns on plaintiffs' demonstration of intent to sue the proper parties." *Cordrey v. Doughty*, 2017 WL 4676593, at *6 (Del. Super. Ct. Oct. 11, 2017).

By contrast, Federal Rule 15(c) "asks what the prospective *defendant* knew or should have known during the [90-day] period, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Krupski*, 560 U.S. at 548. In other words, "[t]he reasonableness of the mistake is not itself at issue." *Id.* at 549. Rather, "[t]he question under Rule 15(c)(1)(C)(ii) is . . . whether [the prospective defendant] knew or should have known that it would have been named as a defendant but for an error." *Id.* at 548. Under the circumstances presented here, the federal relation-back rule is more liberal than the "strict" Delaware rule, and the Court therefore applies the federal rule.

As noted, Wells Fargo, the sole defendant named in the original Complaint, notified Berkshire about the Complaint on November 3, 2017—78 days after the filing of the Complaint and 12 days short of the federal rule's 90-day limit. *ESOF* at ¶ 153. The Complaint asserted the exact same statutory and unjust-enrichment claims against Wells Fargo that are now asserted, in the Amended Complaint, against Wells Fargo and Berkshire. *Compl.*, ECF No. 1, at ¶¶ 102–10. Berkshire therefore cannot—and does not—dispute that the Estate's claims against it "arose out of the conduct, transaction, or occurrence set out . . . in the original pleading," or that Berkshire "received such notice of the action that it [would] not be prejudiced in defending on the merits[.]" Fed. R. Civ. P. 15(c)(1)(C)(i). Instead, Berkshire denies only that it "knew or should have known that the action would have been brought against it, but for a mistake concerning [its] identity." Fed. R. Civ. P. 15(c)(1)(C)(ii).

Contrary to Berkshire's argument, the standard for a "mistake" under Rule 15(c) is met here. The Estate initially brought suit only against Wells Fargo, it appears, because Wells Fargo was the formal owner and beneficiary of the Policy and received payment of the Policy's proceeds, albeit in its role "as securities intermediary." *ESOF* at ¶¶ 134–35. It

was only after the Estate learned that Wells Fargo had transferred the proceeds to Berkshire that the Estate added Berkshire as a defendant. *See, e.g.*, *Estate's Resp. to Berkshire's Mot. for Summ. J.*, ECF No. 147, at p. 27. Nevertheless, the Estate's intent was clear from the start: it meant to bring suit against the "payee" under the Policy. *Compl.*, ECF No. 1, at ¶ 107. Berkshire received notice of the Estate's claim within 90 days after the Complaint was filed, *ESOF* at ¶ 153, and Berkshire should have known immediately that this lawsuit hit close to home. *Cf. Krupski*, 560 U.S. at 554–55 (Rule 15(c) met where the "complaint made clear that [plaintiff] meant to sue the company that 'owned[ and] operated'" the ship on which she was injured, and defendant should have known that it was not named "only because of [plaintiff's] misunderstanding about which . . . entity was in charge of the ship").

Indeed, just two weeks after receiving notice of the Complaint, Berkshire went into litigation mode, jointly demanding with Wells Fargo that Coventry and LST Holdings Ltd. indemnify them in connection with the Estate's claims. *ESOF* at ¶ 154. True, Berkshire took these steps on November 17, 2017—just two days outside the 90-day window. *Id.* But the fact that Berkshire "knew" it was implicated in this suit just after the window closed lends further support to the finding that it "should have known" it was implicated while the window was still open. Fed. R. Civ. P. 15(c)(1)(C)(ii).

In sum, the Estate's statutory claim against Berkshire relates back to its original Complaint, which was filed within the three-year limitations period for statutory claims under Delaware law. Therefore, the statute of limitations poses no bar to the Estate's claim.

### F.  The Estate's claim of unjust enrichment fails because it has a legal remedy

Finally, Berkshire and Wells Fargo both move for summary judgment on the Estate's alternative claim of unjust enrichment. They argue that "there is no evidence that the Estate has conferred any direct benefit" on either Berkshire or Wells Fargo, and that such direct conferral is an element of unjust enrichment "under any of the potentially applicable state's law—*i.e.*, Nebraska (where Berkshire retained the payment), Texas (from where the payment was issued), and Florida (where the Estate resides)." *Berkshire's Mot. for Summ. J.*, ECF No. 133, at p. 22 n.14; *see also Wells Fargo's 2d Mot. for Summ. J.*, ECF No. 136, at p. 5.

However, as was the case with Berkshire's earlier motion to dismiss, Berkshire and Wells Fargo have failed to identify *which* state's law the Court should apply, merely stating

that there is "no scenario wherein Delaware law applies." *Berkshire's Mot. for Summ. J.*, ECF No. 133, at p. 22 n.14; *see also Order Denying Mot. to Dismiss*, ECF No. 174, at p. 7. And the Court has already observed, in denying the motion to dismiss, that "the Texas and Nebraska cases that Berkshire cite[d did] not support" its claim that direct conferral is an element of unjust enrichment in those states. *Order Denying Mot. to Dismiss*, ECF No. 174, at p. 7.

Nevertheless, the Court finds that the Estate's unjust-enrichment claim should be dismissed for a different reason than the one urged by Berkshire and Wells Fargo. In at least three of the four states whose law might govern the Estate's equitable claim, such a claim is barred where an adequate legal remedy is available. *See Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) ("[t]he elements of unjust enrichment" include "the absence of a remedy provided by law"); *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 770 (Tex. 2005) ("[A]n adequate legal remedy may render equitable claims of unjust enrichment . . . unavailable."); *Pilot Inv. Grp. Ltd. v. Hofarth*, 550 N.W.2d 27, 33 (Neb. 1996) ("[E]quitable remedies are generally not available where a statute provides an adequate remedy at law.").

The same appears to be true in Florida, so long as "the remedy at law is 'plain, certain, prompt, speedy, sufficient, complete, practical, and efficient in attaining the ends of justice[.]'" *ThunderWave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1566 (S.D. Fla. 1997) (quoting *Liza Danielle, Inc. v. Jamko, Inc.*, 408 So. 2d 735, 738 (Fla. Dist. Ct. App. 1982)); *see also Bowleg v. Bowe*, 502 So. 2d 71, 72 (Fla. Dist. Ct. App. 1987) ("[T]he theory of unjust enrichment is . . . not available where there is an adequate legal remedy[.]"); *but see Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 400 (Fla. Dist. Ct. App. 1998) (the rule that adequate legal remedies bar equitable relief "does not apply to unjust enrichment claims").

Here, the Court has determined that the Estate has a legal remedy available to it under subsection (b) of Delaware's insurable interest statute. That remedy is plain, certain, efficient and adequate. Indeed, subsection (b) does more than establish a remedy for the Estate—it creates the Estate's right itself. As has been noted, the Estate can claim no contractual rights under a Policy that is "void as against public policy and thus never c[ame] into force." *Price Dawe*, 28 A.3d at 1065. And even if the Policy were valid, Ms. Malkin voluntarily relinquished "all right, title an[d] interest" in the Policy before she passed away. *ESOF* at ¶¶ 121–24. Thus, were it not for subsection (b), Ms. Malkin's Estate would have no

right to the Policy's proceeds, in contract, in equity or otherwise. Nevertheless, the Estate does have subsection (b), and that is enough.

For all of these reasons, the Estate's alternative claim of unjust enrichment must be dismissed. *Cf. Tillman ex rel. Estate of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1309 (10th Cir. 2005) (unjust-enrichment claim properly dismissed where plaintiff had a legal remedy under an analogous provision of Oklahoma's insurance code).

## IV. CONCLUSION

For the reasons set forth above, it is hereby **ORDERED and ADJUDGED** that Wells Fargo's Motions for Summary Judgment (ECF Nos. 77, 136), Berkshire's Motion for Summary Judgment (ECF No. 133) and the Estate's Motion for Summary Judgment (ECF No. 138) are each **GRANTED** *in part* **and DENIED** *in part* as follows.

The Court finds as a matter of law that: 1) the Estate's statutory claim is governed by Delaware law; 2) the Policy in this case lacked an insurable interest at inception and was therefore void *ab initio* under Delaware law; 3) Ms. Malkin did not relinquish her Estate's statutory right to the Policy's proceeds; 4) Berkshire and Wells Fargo's UCC-based defenses fail as a matter of law; 5) the Estate's statutory claim is not time-barred; and 6) the Estate is entitled to recover the Policy's proceeds under Del. Code Ann. tit. 18, § 2704(b). Finally, the Estate's unjust-enrichment claim is dismissed.

The Court does not make any finding regarding: 1) the apportionment of damages between Berkshire and Wells Fargo; 2) whether those damages are offset by any premium or other payments made by Berkshire or Wells Fargo; or 3) any other claims, defenses or counterclaims asserted since the Parties' motions for summary judgment were filed.

**DONE and ORDERED** in Chambers, in Miami, Florida, this 29th day of March 2019.

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Lauren Louis, U.S. Magistrate Judge*
*Counsel of record*